## APPALACHIAN COALS, INC., ET AL. v. UNITED STATES.

No. 504. Argued January 9, 10, 1933.—Decided March 13, 1933.

*Messrs. Wm. J. Donovan* and *Edgar L. Greever,* with whom *Mr. Horace R. Lamb* was on the brief, for appellants.

*Assistant to the Attorney General O'Brian*, with whom *Solicitor General Thacher* and *Messrs. Charles H. Weston* and *Hammond E. Chaffetz* were on the brief, for the United States.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

This suit was brought to enjoin a combination alleged to be in restraint of interstate commerce in bituminous coal and in attempted monopolization of part of that commerce, in violation of §§ 1 and 2 of the Sherman Anti-Trust Act, 26 Stat. 209. The District Court, composed of three Circuit Judges, made detailed findings of fact and entered final decree granting the injunction. 1 F. Supp. 339. The case comes here on appeal. 28 U. S. C., 380.

Defendants, other than Appalachian Coals, Inc., are 137 producers of bituminous coal in eight districts (called for

convenience Appalachian territory) lying in Virginia, West Virginia, Kentucky and Tennessee. These districts, described as the Southern High Volatile Field, form part of the coal-bearing area stretching from central and western Pennsylvania through eastern Ohio, western Maryland, West Virginia, southwestern Virginia, eastern Kentucky, eastern Tennessee, and northeastern Alabama. In 1929 (the last year for which complete statistics were available) the total production of bituminous coal east of the Mississippi river was 484,786,000 tons, of which defendants mined 58,011,367 tons, or 11.96 per cent. In the so-called Appalachian territory and the immediately surrounding area, the total production was 107,008,209 tons, of which defendants' production was 54.21 per cent, or 64 per cent if the output of 'captive' mines (16,455,001 tons) be deducted.[1] With a further deduction of 12,000,000 tons of coal produced in the immediately surrounding territory, which, however, is not essentially different from the particular area described in these proceedings as Appalachian territory, defendants' production in the latter region was found to amount to 74.4 per cent.[2]

The challenged combination lies in the creation by the defendant producers of an exclusive selling agency. This agency is the defendant Appalachian Coals, Inc., which may be designated as the Company. Defendant producers own all its capital stock, their holdings being in

[1] "Captive" mines are thus designated as they produce chiefly for the consumption of the owners.

[2] Defendants contend that, in calculating their position upon a percentage basis, surrounding territory should be included and that their percentage thus lies "somewhere between 54–21 and 64 per cent." The District Court found: "The coal produced in the surrounding territory is the same kind of coal as that produced in the Appalachian territory and is suitable for the same purposes and available to the same markets, generally on the same freight rates, and for all practical purposes might have been included in the territory described as Appalachian territory."

proportion to their production. The majority of the common stock, which has exclusive voting right, is held by seventeen defendants. By uniform contracts, separately made, each defendant producer constitutes the Company an exclusive agent for the sale of all coal (with certain exceptions) which the producer mines in Appalachian territory.[3] The Company agrees to establish standard classifications, to sell all the coal of all its principals at the best prices obtainable and, if all cannot be sold, to apportion orders upon a stated basis. The plan contemplates that prices are to be fixed by the officers of the Company at its central office, save that, upon contracts calling for future deliveries after sixty days, the Company must obtain the producer's consent. The Company is to be paid a commission of ten per cent of the gross selling prices f. o. b. at the mines, and guarantees accounts. In order to preserve their existing sales' outlets, the producers may designate sub-agents, according to an agreed form of contract, who are to sell upon the terms and prices established by the Company and are to be allowed by the Company commissions of eight per cent. The Company has not yet begun to operate as selling agent; the contracts with it run to April 1, 1935, and from year to year thereafter unless terminated by either party on six months' notice.

The Government's contention, which the District Court sustained, is that the plan violates the Sherman Anti-Trust Act,—in the view that it eliminates competition among the defendants themselves and also gives the selling agency power substantially to affect and control the price of bituminous coal in many interstate markets. On the latter point the District Court made the general finding that "this elimination of competition and con-

---

[3] Exception is made of deliveries on contracts then outstanding and of coal used in the operations of defendant's mines or sold to its employees.

certed action will affect market conditions, and have a tendency to stabilize prices and to raise prices to a higher level than would prevail under conditions of free competition." The court added that the selling agency "will not have monopoly control of any market nor the power to fix monopoly prices."

Defendants insist that the primary purpose of the formation of the selling agency was to increase the sale, and thus the production, of Appalachian coal through better methods of distribution, intensive advertising and research; to achieve economies in marketing, and to eliminate abnormal, deceptive and destructive trade practices. They disclaim any intent to restrain or monopolize interstate commerce; and in justification of their design they point to the statement of the District Court that " it is but due to defendants to say that the evidence in the case clearly shows that they have been acting fairly and openly, in an attempt to organize the coal industry and to relieve the deplorable conditions resulting from overexpansion, destructive competition, wasteful trade practices, and the inroads of competing industries." 1 F. Supp., p. 341. Defendants contend that the evidence establishes that the selling agency will not have the power to dominate or fix the price of coal in any consuming market; that the price of coal will continue to be set in an open competitive market; and that their plan by increasing the sale of bituminous coal from Appalachian territory will promote, rather than restrain, interstate commerce.

*First.* There is no question as to the test to be applied in determining the legality of the defendants' conduct. The purpose of the Sherman Anti-Trust Act is to prevent undue restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influences of monopolistic endeavor. As a charter of freedom, the Act

has a generality and adaptability comparable to that found to be desirable in constitutional provisions. It does not go into detailed definitions which might either work injury to legitimate enterprise or through particularization defeat its purposes by providing loopholes for escape. The restrictions the Act imposes are not mechanical or artificial. Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness. They call for vigilance in the detection and frustration of all efforts unduly to restrain the free course of interstate commerce, but they do not seek to establish a mere delusive liberty either by making impossible the normal and fair expansion of that commerce or the adoption of reasonable measures to protect it from injurious and destructive practices and to promote competition upon a sound basis. The decisions establish, said this Court in *Nash* v. *United States,* 229 U. S. 373, 376, " that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade." See *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106; *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238; *Window Glass Manufacturers* v. *United States,* 263 U. S. 403, 412; *Maple Flooring Association* v. *United States,* 268 U. S. 563, 583, 584; *Paramount Famous Corp.* v. *United States,* 282 U. S. 30, 43; *Standard Oil Co.* v. *United States,* 283 U. S. 163, 169.

In applying this test, a close and objective scrutiny of particular conditions and purposes is necessary in each case. Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it. " The legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains

competition. Every agreement concerning trade, every regulation of trade, restrains." *Chicago Board of Trade* v. *United States, supra.* The familiar illustrations of partnerships, and enterprises fairly integrated in the interest of the promotion of commerce, at once occur. The question of the application of the statute is one of intent and effect, and is not to be determined by arbitrary assumptions. It is therefore necessary in this instance to consider the economic conditions peculiar to the coal industry, the practices which have obtained, the nature of defendant's plan of making sales, the reasons which led to its adoption, and the probable consequences of the carrying out of that plan in relation to market prices and other matters affecting the public interest in interstate commerce in bituminous coal.

*Second.* The findings of the District Court, upon abundant evidence, leave no room for doubt as to the economic condition of the coal industry. That condition, as the District Court states, " for many years has been indeed deplorable." Due largely to the expansion under the stimulus of the Great War, " the bituminous mines of the country have a developed capacity exceeding 700,000,000 tons " to meet a demand " of less than 500,000,000 tons." In connection with this increase in surplus production, the consumption of coal in all the industries which are its largest users has shown a substantial relative decline. The actual decrease is partly due to the industrial condition but the relative decrease is progressing, due entirely to other causes. Coal has been losing markets to oil, natural gas and water power and has also been losing ground due to greater efficiency in the use of coal. The change has been more rapid during the last few years by reason of the developments of both oil and gas fields. The court below found that " Based upon the assumption that bituminous coal would have maintained the upward trend prevailing between 1900 and 1915 in percentage of total

energy supply in the United States, the total substitution between 1915 and 1930 has been equal to more than 200,-000,000 tons per year."[4] While proper allowance must be made for differences in consumption in different parts of the country,[5] the adverse influence upon the coal industry, including the branch of it under review, of the use of substitute fuels and of improved methods is apparent.

This unfavorable condition has been aggravated by particular practices. One of these relates to what is called "distress coal." The greater part of the demand is for particular sizes of coal such as nut and slack, stove coal, egg coal, and lump coal. Any one size cannot be prepared without making several sizes. According to the finding of the court below, one of the chief problems of

---

[4] The findings show that "The number of domestic oil burners in use has increased more than sixty fold . . . from 1921 to 1931. . . . About fifty per cent of all oil burners, both domestic and commercial, are in the markets in which Appalachian coals are sold. The railroads have improved combustion methods and reduced their fuel consumption from 1916 to 1929 by 32,000,000 tons. In freight service, their consumption of coal per thousand freight ton miles dropped from 164 pounds in 1919 to 125 pounds in 1929. The electric industries decreased consumption of coal per kilowatt hour from approximately 3.2 pounds to 1.6 pounds and thereby reduced their requirements for coal in excess of 47,000,000 tons. Efficiency in the smelting of pig iron decreased the consumption of coal in relation to the pig iron made by 10,000,000 tons. The saving in by-product coke manufactures over the bee hive system amounted to 12,000,000 tons."

[5] The court below points out that "the use of natural gas and fuel oil is limited to certain areas. Gas is not available to all sections of the country and the great centers of fuel oil consumption are California, the southwest, the midcontinent field and the Atlantic seaboard. Moreover, in the States in which Appalachian coal is chiefly marketed, the substitute fuels combined supply only about ten per cent of the total energy consumption. In the year 1929 about fifty per cent of defendants' coal, other than railroad fuel, went into the States of Ohio, Michigan, Indiana and Illinois." In these States the percentage of total energy consumption derived from bituminous coal in 1929 ranged from 88.7 per cent to 92.7 per cent.

the industry is thus involved in the practice "of producing different sizes of coal even though orders are on hand for only one size, and the necessity of marketing all sizes." Usually there are no storage facilities at the mines and the different sizes produced are placed in cars on the producer's tracks, which may become so congested that either production must be stopped or the cars must be moved regardless of demand. This leads to the practice of shipping unsold coal to billing points or on consignment to the producer or his agent in the consuming territory. If the coal is not sold by the time it reaches its destination, and is not unloaded promptly, it becomes subject to demurrage charges which may exceed the amount obtainable for the coal unless it is sold quickly. The court found that this type of "distress coal" presses on the market at all times, includes all sizes and grades, and the total amount from all causes is of substantial quantity.

"Pyramiding" of coal is another "destructive practice." It occurs when a producer authorizes several persons to sell the same coal, and they may in turn offer it for sale to other dealers. In consequence " the coal competes with itself, thereby resulting in abnormal and destructive competition which depresses the price for all coals in the market." Again, there is misrepresentation by some producers in selling one size of coal and shipping another size which they happen to have on hand. " The lack of standardization of sizes and the misrepresentation as to sizes " are found to have been injurious to the coal industry as a whole. The court added, however, that the evidence did not show the existence of any trade war or widespread fraudulent conduct. The industry also suffers through " credit losses," which are due to the lack of agencies for the collection of comprehensive data with respect to the credits that can safely be extended.

In addition to these factors, the District Court found that organized buying agencies, and large consumers

purchasing substantial tonnages, "constitute unfavorable forces." "The highly organized and concentrated buying power which they control and the great abundance of coal available have contributed to make the market for coal a buyers' market for many years past."

It also appears that the "unprofitable condition" of the industry has existed particularly in the Appalachian territory where there is little local consumption, as the region is not industrialized. "The great bulk of the coal there produced is sold in the highly competitive region east of the Mississippi river and north of the Ohio river under an adverse freight rate which imposes an unfavorable differential from 35 cents to 50 cents per ton."[6] And in a graphic summary of the economic situation, the court found that "numerous producing companies have gone into bankruptcy or into the hands of receivers, many mines have been shut down, the number of days of operation per week have been greatly curtailed, wages to labor have been substantially lessened, and the States in which coal producing companies are located have found it increasingly difficult to collect taxes."

*Third.* The findings also fully disclose the proceedings of the defendants in formulating their plan and the reasons for its adoption. The serious economic conditions had led to discussions among coal operators and state and national officials, seeking improvement of the industry. Governors of States had held meetings with coal producers. The limits of official authority were apparent. A general meeting of producers, sales agents and attorneys was held in New York in October, 1931, a committee was appointed and various suggestions were considered. At a second general meeting in December, 1931, there was further discussion and a report which recommended

---

[6] Defendants insist that "the real spread is from 25 cents to $1.84 per ton."

the organization of regional sales agencies, and was supported by the opinion of counsel as to the legality of proposed forms of contract, was approved. Committees to present the plan to producers were constituted for eighteen producing districts including the eight districts in Appalachian territory. Meetings of the representatives of the latter districts resulted in the organization of defendant Appalachian Coals, Inc. It was agreed that a minimum of 70 per cent and a maximum of 80 per cent of the commercial tonnage of the territory should be secured before the plan should become effective. Approximately 73 per cent was obtained. A resolution to fix the maximum at 90 per cent was defeated. The maximum of 80 per cent was adopted because a majority of the producers felt that an organization with a greater degree of control might unduly restrict competition in local markets. The minimum of 70 per cent was fixed because it was agreed that the organization would not be effective without this degree of control, The court below also found that it was the expectation that similar agencies would be organized in other producing districts including those which were competitive with Appalachian coal, and that it was " the particular purpose of the defendants in the Appalachian territory to secure such degree of control therein as would eliminate competition among the 73 per cent of the commercial production." But the court added: " However, the formation of Appalachian Coals was not made dependent upon the formation of other regional selling agencies and there is no evidence of a purpose, understanding or agreement among the defendants that in the event of the formation of other similar regional sales agencies there would be any understanding or agreement, direct or indirect, to divide the market territory between them or to limit production or to fix the price of coal in any market or to coöperate in any way." When, in January, 1932, the Department of Jus-

tice announced its adverse opinion, the producers outside
Appalachian territory decided to hold their plans in abey-
ance pending the determination of the question by the
courts. The District Court found that "the evidence
tended to show that other selling agencies with a control
of at least 70 per cent of the production in their respective
districts will be organized if the petition in this case is
dismissed"; that in that event "there will result an
organization in most of the districts whose coal is or may
be competitive with Appalachian coal; but the testimony
tends to show that there will still be substantial, active
competition in the sale of coal in all markets in which
Appalachian coal is sold."

Defendants refer to the statement of purposes in their
published plan of organization,—that it was intended to
bring about "a better and more orderly marketing of
the coals from the region to be served by this company
(the selling agency) and better to enable the producers
in this region, through the larger and more economic
facilities of such selling agency, more equally to compete
in the general markets for a fair share of the available coal
business." The District Court found that among their
purposes, defendants sought to remedy "the destructive
practice of shipping coal on consignment without prior
orders for the sale thereof, which results in the dumping of
coal on the market irrespective of the demand"; "to
eliminate the pyramiding of offers for the sale of coal";
to promote "the systematic study of the marketing and
distribution of coal, the demand and the consumption and
the kinds and grades of coal made and available for ship-
ment by each producer in order to improve conditions";
to maintain an inspection and engineering department,
which would keep in constant contact with customers
"in order to demonstrate the advantages and suitabil-
ity of Appalachian coal in comparison with other com-
petitive coals"; to promote an extensive advertising

campaign which would show "the advantages of using coal as a fuel and the advantages of Appalachian coal particularly"; to provide a research department employing combustion engineers which would demonstrate "proper and efficient methods of burning coal in factories and in homes" and thus aid producers in their competition with substitute fuels; and to operate a credit department which would build up a record with respect to the "reliability of purchasers." The court also found that "Defendants believe that the result of all these activities would be the more economical sale of coal, and the economies would be more fully realized as the organization of the selling agent is perfected and developed." But in view of the designation of sub-agents, economies in selling expenses would be attained "only after a year or so of operation."

No attempt was made to limit production. The producers decided that it could not legally be limited and, in any event, it could not be limited practically. The finding is that "it was designed that the producer should produce and the selling agent should sell as much coal as possible." The importance of increasing sales is said to lie in the fact that the cost of production is directly related to the actual running time of the mines.

*Fourth.* Voluminous evidence was received with respect to the effect of defendants' plan upon market prices. As the plan has not gone into operation, there are no actual results upon which to base conclusions. The question is necessarily one of prediction. The court below found that, as between defendants themselves, competition would be eliminated. This was deemed to be the necessary consequence of a common selling agency with power to fix the prices at which it would make sales for its principals. Defendants insist that the finding is too broad and that the differences in grades of coal of the same sizes, and the market demands at different times,

would induce competition between the coals sold by the agency "depending upon the use and the quality of the coals."

The more serious question relates to the effect of the plan upon competition between defendants and other producers. As already noted, the District Court found that "the great bulk" of the coal produced in Appalachian territory is sold "in the highly competitive region east of the Mississippi river and north of the Ohio river under an adverse freight rate." Elaborate statistics were introduced with respect to the production and distribution of bituminous coal and the transportation rates from the different producing sections to the consuming markets, as bearing upon defendants' competitive position, together with evidence as to the requirements of various sections and consumers and the relative advantages possessed by reason of the different qualities and uses of the coals produced. It would be impossible to make even a condensed statement of this evidence, (which has been carefully analyzed by both parties,) but an examination of it fails to disclose an adequate basis for the conclusion that the operation of the defendants' plan would produce an injurious effect upon competitive conditions, in view of the vast volume of coal available, the conditions of production, and the network of transportation facilities at immediate command. While strikes and interruptions of transportation may create temporary and abnormal dislocations, the bituminous coal industry under normal conditions affords most exceptional competitive opportunities. Figures as to developed and potential productive capacity are impressive. The court below found upon this point that the capacity of the mines in the Appalachian region operated by others than defendants is 82,660,760 tons, as against the capacity of defendants' mines of 86,628,880 tons, while the present yearly capacity of all mines in southern West Virginia, Virginia, eastern Kentucky and Tennessee is 245,-233,560 tons, based upon an eight-hour working day.

" This excess capacity over actual production," the court said, " could be brought into production at moderate expense and with reasonable promptness." As to potential, undeveloped capacity in Appalachian territory, the court found that in the eight districts in this region not held by any operating, or by any captive, company, there are approximately 760,000 acres containing more than 4,300,-000,000 tons of recoverable coal. In addition, in the same territory " owned by captive companies and not being operated, or owned by operating companies who are using only a very small proportion of their holdings," there is an additional 860,000 acres, containing more than 4,600,-000,000 tons of coal. Within the twenty-four counties in which defendants' mines are located, and immediately adjacent to them, on railroads already operating, " with the exception of short, feeder extensions," there are over 1,620,000 acres of coal bearing land, containing approximately 9,000,000,000 net tons of recoverable coal " comparable both in quality and mining conditions with the coal now being mined in that region." " The opening up of this acreage would involve only the extension of short branch lines from the railroads and the building of mining plants. The price of these lands at the present time would be less than half of the value of two or three years ago, and considerably less on a royalty basis. Coal produced from these districts is available for any market in which Appalachian coal is sold. Conditions in the coal industry are such that new companies are free to enter the business of producing and marketing coal in competition with existing companies." In connection with this proof of developed and potential capacity, the " highly organized and concentrated buying power " that can be exerted must also have appropriate consideration.[7]

---

[7] J. M. Dewberry, general coal and coke agent of the Louisville & Nashville Railroad, a large consumer of Appalachian coal, testified: " It is a well known fact today that the buying power of these large consumers of coal is more intelligent, more forceful, more far-reaching

Consumers testified that defendants' plan will be a benefit to the coal industry and will not restrain competition. Testimony to that effect was given by representatives of the Louisville & Nashville Railroad, the Norfolk & Western Railroad, and the Chesapeake & Ohio Railroad, " the largest railroad users of coal operating in the Appalachian region," and by representatives of large utility companies and manufacturing concerns.[8] There

---

than ever before in the history of the industry. And it just sounds to me like a joke for somebody to talk about Appalachian Coals or somebody else dictating the price that they are going to pay. They dictate their own price. The purchaser makes it. And he makes it because of the tremendous force and influence of his buying power. Why, it is nothing these days for one interest or one concern to buy several million tons of coal."

[8] The District Court in its findings, after referring to the railroads above mentioned, continues: "A representative of a large public utility company " (with extensive power lines in the middle west and on the Atlantic seaboard) " consuming annually approximately 2,485,000 tons of coal has stated that the organization and operation of Appalachian Coals, Inc. will not affect competition in the markets in which his company buys coal, and that it will have a beneficial effect on the coal industry. A representative of a power company operating throughout the State of Georgia . . . using from 30,000 to 125,000 tons of coal annually, has stated that the organization and operation of Appalachian Coals, Inc. will not restrain competition in the markets in which his company buys coal. A representative of the Carbide and Carbon Corporation which uses annually about 250,000 tons of bituminous coal, 100,000 tons of coke made from bituminous coal, and 40,000 to 50,000 tons of petroleum coke, and operating plants that consume coal at South Charleston, West Virginia; Niagara Falls, New York; Cleveland, Ohio; Sault Ste. Marie, Michigan; Indianapolis, Indiana, and Fremont and Fostoria, Ohio, has stated that the organization of Appalachian Coals, Inc., will have a beneficial effect in the coal industry and will not restrain competition in the markets in which his company buys coal. The largest purchaser of coal in the States of North Carolina, South Carolina, Georgia and eastern Tennessee who purchases approximately 600,000 tons of coal annually under normal conditions for use by textile mills, located in those States, has stated that the organization and operation of Appalachian

was similar testimony by wholesale and retail dealers in coal. There are 130 producers of coal other than defendants in Appalachian territory who sell coal commercially. There are also " a large number of mines that have been shut down and could be opened up by the owners on short notice." Competing producers testified that the operation of the selling agency, as proposed by defendants, would not restrain competition and would not hurt their business. Producers in western Pennsylvania, Alabama, Ohio and Illinois testified to like effect. Referring to this testimony, the court below added, " The small coal producer can, to some extent, and for the purpose of producing and marketing coal, produce coal more cheaply than many of the larger companies, and is not prevented by higher cost of operation from being a competitor in the market."

The Government criticises the " opinion testimony " introduced by defendants as relating to a competitive situation not within the experience of the witnesses, and also animadverts upon their connections and interests, but the Government did not offer testimony of opposing opinions as to the effect upon prices of the operation of the selling agency. Consumers who testified for the Government explained their dependence upon coal from Appalachian territory.

The District Court commented upon the testimony of officers of the selling agency to the effect " that the organization would not be able to fix prices in an arbitrary way but, by the elimination of certain abuses, and by better advertising and sale organization, the producers would get more in the aggregate for their coal." " Other witnesses for the defendants " said the court, " indicated that there would be some tendency to raise the price but

Coals, Inc. will not control or dominate the price in the markets in which he purchases coal, and that he will be able to purchase coal in an open and competitive market."

that the degree of increase would be affected by other competitors in the coal industry and by producers of coal substitutes."

*Fifth.* We think that the evidence requires the following conclusions:

(1). With respect to defendant's purposes, we find no warrant for determining that they were other than those they declared. Good intentions will not save a plan otherwise objectionable, but knowledge of actual intent is an aid in the interpretation of facts and prediction of consequences. *Chicago Board of Trade* v. *United States, supra.* The evidence leaves no doubt of the existence of the evils at which defendants' plan was aimed. The industry was in distress. It suffered from over-expansion and from a serious relative decline through the growing use of substitute fuels. It was afflicted by injurious practices within itself,—practices which demanded correction. If evil conditions could not be entirely cured, they at least might be alleviated. The unfortunate state of the industry would not justify any attempt unduly to restrain competition or to monopolize, but the existing situation prompted defendants to make, and the statute did not preclude them from making, an honest effort to remove abuses, to make competition fairer, and thus to promote the essential interests of commerce. The interests of producers and consumers are interlinked. When industry is grievously hurt, when producing concerns fail, when unemployment mounts and communities dependent upon profitable production are prostrated, the wells of commerce go dry. So far as actual purposes are concerned, the conclusion of the court below was amply supported that defendants were engaged in a fair and open endeavor to aid the industry in a measurable recovery from its plight. The inquiry then, must be whether despite this objective the inherent nature of their plan was such as to create an undue restraint upon interstate commerce.

(2). The question thus presented chiefly concerns the effect upon prices. The evidence as to the conditions of the production and distribution of bituminous coal, the available facilities for its transportation, the extent of developed mining capacity, and the vast potential undeveloped capacity, makes it impossible to conclude that defendants through the operation of their plan will be able to fix the price of coal in the consuming markets. The ultimate finding of the District Court is that the defendants " will not have monopoly control of any market, nor the power to fix monopoly prices "; and in its opinion the court stated that " the selling agency will not be able, we think, to fix the market price of coal." Defendants' coal will continue to be subject to active competition. In addition to the coal actually produced and seeking markets in competition with defendants' coal, enormous additional quantities will be within reach and can readily be turned into the channels of trade if an advance of price invites that course. While conditions are more favorable to the position of defendants' group in some markets than in others, we think that the proof clearly shows that, wherever their selling agency operates, it will find itself confronted by effective competition backed by virtually inexhaustible sources of supply, and will also be compelled to cope with the organized buying power of large consumers. The plan cannot be said either to contemplate or to involve the fixing of market prices.

The contention is, and the court below found, that while defendants could not fix market prices, the concerted action would " affect " them, that is, that it would have a tendency to stabilize market prices and to raise them to a higher level than would otherwise obtain. But the facts found do not establish, and the evidence fails to show, that any effect will be produced which in the circumstances of this industry will be detrimental to fair competition. A coöperative enterprise, otherwise free

from objection, which carries with it no monopolistic menace, is not to be condemned as an undue restraint merely because it may effect a change in market conditions, where the change would be in mitigation of recognized evils and would not impair, but rather foster, fair competitive opportunities. Voluntary action to rescue and preserve these opportunities, and thus to aid in relieving a depressed industry and in reviving commerce by placing competition upon a sounder basis, may be more efficacious than an attempt to provide remedies through legal processes. The fact that the correction of abuses may tend to stabilize a business, or to produce fairer price levels, does not mean that the abuses should go uncorrected or that coöperative endeavor to correct them necessarily constitutes an unreasonable restraint of trade. The intelligent conduct of commerce through the acquisition of full information of all relevant facts may properly be sought by the coöperation of those engaged in trade, although stabilization of trade and more reasonable prices may be the result. *Maple Flooring Association* v. *United States, supra; Cement Manufacturers Association* v. *United States*, 268 U. S. 588, 604. Putting an end to injurious practices, and the consequent improvement of the competitive position of a group of producers, is not a less worthy aim and may be entirely consonant with the public interest, where the group must still meet effective competition in a fair market and neither seeks nor is able to effect a domination of prices.

Decisions cited in support of a contrary view were addressed to very different circumstances from those presented here. They dealt with combinations which on the particular facts were found to impose unreasonable restraints through the suppression of competition, and in actual operation had that effect. *American Column & Lumber Co.* v. *United States*, 257 U. S. 377; *United States*

v. *American Linseed Oil Co.*, 262 U. S. 371. Compare *Maple Flooring Association* v. *United States, supra,* at pp. 579–582. In *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, the combination was effected by those who were in a position to deprive, and who sought to deprive, the public in a large territory of the advantages of fair competition, and was for the actual purpose, and had the result, of enhancing prices,—which in fact had been unreasonably increased. *Id.,* pp. 237, 238. In *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, defendants, who controlled 82 per cent of the business of manufacturing and distributing vitreous pottery in the United States, had combined to fix prices. It was found that they had the power to do this and had exerted it. The defense that the prices were reasonable was overruled, as the court held that the power to fix prices involved " power to control the market and to fix arbitrary and unreasonable prices," and that in such a case the difference between legal and illegal conduct could not " depend upon so uncertain a test " as whether the prices actually fixed were reasonable,—a determination which could " be satisfactorily made only after a complete survey of our economic organization and a choice between rival philosophies." See *United States* v. *Cohen Grocery Co.,* 255 U. S. 81. In the instant case there is, as we have seen, no intent or power to fix prices, abundant competitive opportunities will exist in all markets where defendants' coal is sold, and nothing has been shown to warrant the conclusion that defendants' plan will have an injurious effect upon competition in these markets.

(3). The question remains whether, despite the foregoing conclusions, the fact that the defendants' plan eliminates competition between themselves is alone sufficient to condemn it. Emphasis is placed upon defendants' control of about 73 per cent of the commercial produc-

tion in Appalachian territory. But only a small percentage of that production is sold in that territory. The finding of the court below is that " these coals are mined in a region where there is very little consumption." Defendants must go elsewhere to dispose of their products, and the extent of their production is to be considered in the light of the market conditions already described. Even in Appalachian territory it appears that the developed and potential capacity of other producers will afford effective competition.[9] Defendants insist that on the evidence adduced as to their competitive position in the consuming markets, and in the absence of proof of actual operations showing an injurious effect upon competition, either through possession or abuse of power, no valid objection could have been interposed under the Sherman Act if the defendants had eliminated competition between themselves by a complete integration of their mining properties in a single ownership. *United States* v. *U. S. Steel Corp.*, 251 U. S. 417; *United States* v. *International Harvester Co.*, 274 U. S. 693. We agree that there is no ground for holding defendants' plan illegal merely because they have not integrated their properties and have chosen to maintain their independent plants, seeking not to limit but rather to facilitate production. We know of no public policy, and none is suggested by the terms of the Sherman Act, that, in order to comply with the law, those engaged in industry should be driven to unify their properties and businesses, in order to correct abuses which may be corrected by less drastic measures. Public policy might indeed be deemed to point in a different direction. If the mere size of a single, embracing entity is not enough to bring a combination in corporate form within the statutory inhibition, the mere number and extent of the production of those engaged in a coöperative endeavor to

---

[9] *Supra*, pp. 10, 11.

remedy evils which may exist in an industry, and to improve competitive conditions, should not be regarded as producing illegality. The argument that integration may be considered a normal expansion of business, while a combination of independent producers in a common selling agency should be treated as abnormal—that one is a legitimate enterprise and the other is not—makes but an artificial distinction. The Anti-Trust Act aims at substance. Nothing in theory or experience indicates that the selection of a common selling agency, to represent a number of producers should be deemed to be more abnormal than the formation of a huge corporation bringing various independent units into one ownership. Either may be prompted by business exigencies, and the statute gives to neither a special privilege. The question in either case is whether there is an unreasonable restraint of trade or an attempt to monopolize. If there is, the combination cannot escape because it has chosen corporate form; and, if there is not, it is not to be condemned because of the absence of corporate integration. As we stated at the outset, the question under the Act is not simply whether the parties have restrained competition between themselves but as to the nature and effect of that restraint. *Chicago Board of Trade* v. *United States, supra; United States* v. *Terminal Association,* 224 U. S. 383; *Window Glass Manufacturers* v. *United States, supra; Standard Oil Co.* v. *United States,* 283 U. S. 163, 169, 179.

The fact that the suit is brought under the Sherman Act does not change the principles which govern the granting of equitable relief. There must be " a definite factual showing of illegality." *Standard Oil Co.* v. *United States,* 283 U. S. p. 179. We think that the Government has failed to show adequate grounds for an injunction in this case. We recognize, however, that the case has been tried in advance of the operation of defendants' plan, and that it has been necessary to test that plan with

reference to purposes and anticipated consequences without the advantage of the demonstrations of experience. If in actual operation it should prove to be an undue restraint upon interstate commerce, if it should appear that the plan is used to the impairment of fair competitive opportunities, the decision upon the present record should not preclude the Government from seeking the remedy which would be suited to such a state of facts. We think also that, in the event of future controversy arising from the actual operation of the plan, the results of the labor of both parties in this litigation in presenting the voluminous evidence as to the industry, market conditions and transportation facilities and rates, should continue to be available, without the necessity of reproducing that evidence.

The decree will be reversed and the cause will be remanded to the District Court with instructions to enter a decree dismissing the bill of complaint without prejudice and with the provision that the court shall retain jurisdiction of the cause and may set aside the decree and take further proceedings if future developments justify that course in the appropriate enforcement of the Anti-Trust Act.

*Reversed and remanded.*

MR. JUSTICE MCREYNOLDS thinks that the court below reached the proper conclusion and that its decree should be affirmed.