## UNITED STATES v. STANDARD OIL COMPANY (INDIANA) et al. *

No. 11365.

District Court, W. D. Wisconsin.

July 19, 1938.

938

W. P. Crawford, of Superior, Wis., John Henry Lewin, Hammond E. Chaffetz, W. B. Watson Snyder, and Grant W. Kelleher, Sp. Assts. to Atty. Gen., and John J. Boyle, U. S. Atty., of Madison, Wis., for the United States.

William J. Donovan, of New York City, Herbert H. Thomas, of Madison, Wis., J. Edward Lumbard, Jr., Ralstone R. Irvine, and Granville Whittlesey, Jr., all of New York City, and San W. Orr, of Madison, Wis., general counsel for defendants.

Louis L. Stephens, Buell F. Jones, Weymouth Kirkland, David Fisher, and John L. McInerney, all of Chicago, Ill., for defendants Standard Oil Co. (Ind.) and others.

W. P. Z. German and Alvin F. Molony, both of Tulsa, Okl., for Skelly Oil Co. and another.

Wm. Dewey Loucks and John F. O'Ryan, both of New York City, and E. C. Mead, of Tulsa, Okl., for Barnsdall Refining Corp. and another.

Ralph Horween, of Chicago, Ill., for Globe Oil & Refining Co. (Okl.) and others.

Rupert Thomas, Jr., and Bethuel M. Webster, Jr., both of New York City, for Edward L. Shea and others.

J. C. Denton and John P. Greve, both of Tulsa, Okl., and J. Craig McLanahan, of Baltimore, Md., for Mid-Continent Petroleem Corp. and others.

Don Emery, of Bartlesville, Okl., Amos L. Beaty, of Houston, Tex., Walter L. Barnes, of Des Moines, Iowa, and Rayburn L. Foster, of Bartlesville, Okla., for Phillips Petroleum Co. and others.

Louis Mead Treadwell, of New York City, for Socony-Vacuum Oil Co., Inc., and others.

Goldthwaite H. Dorr, of New York City, for Charles E. Arnott.

James J. Cosgrove and William H. Zwick, both of Ponca City, Okl., and Dan Moody, of Austin, Tex., for Continental Oil Co. and others.

Vinson, Elkins, Weems & Francis and Charles I. Francis, all of Houston, Tex.,

and Carl N. Hill, of Madison, Wis., for Pure Oil Co. and others.

Samuel A. Mitchell and Truman Post Young, both of St. Louis, Mo., for Shell Petroleum Co. and others.

G. T. Stanford, Roy T. Osborn, and Frederick Wood, all of New York City, for Sinclair Refining Co. and another.

J. H. Marshutz, of Milwaukee, Wis., for Wadhams Oil Co. and another.

Charles E. Gately, of New York City, E. L. Wingert, of Madison, Wis., Chas A. Frueauff, of New York City, and Theo. Brazeau, of Wisconsin Rapids, Wis., for Cities Service Co. and others.

STONE, District Judge.

Realizing the importance to the Government and the defendants of a correct decision of the questions raised on the motions after verdict, and being conscious of the responsibility necessarily cast upon the Court, I have made a careful and thoughtful restudy of the evidence as it applies to each defendant, separately and jointly. I have considered in detail the contentions of all the defendants as advanced in the motions after verdict, and have studied the many able briefs submitted on behalf of the Government and the defendants. This record runs to more than 12,000 pages, in addition to over 1,000 exhibits.

The convincing force of much of the testimony relates in widely varying degrees to different defendants. It shows that the defendants were in varying situations in relation to the acts complained of by the Government.

The trial lasted nearly four months, during all of which time the jury was kept sequestered and in the custody of the marshal. At the close of the trial there were presented motions in behalf of each defendant, requiring, for intelligent disposal, a complete knowledge of this monumental record as it applied to each defendant. I felt, then, that to have kept the jurors sequestered while each of these motions received full and careful consideration, would have been unjust and unfair to them.

The charge against the defendants lay in a field of economic controversy. Violations of the anti-trust laws are different from crimes which are mala in se. The Department of Justice has, in each case where it believes a violation has occurred, the choice of a civil or criminal proceeding. It recognizes that the rule of reason, long con-

sidered essential in administering the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq., makes sharply defined standards impossible.

In view of these circumstances, I concluded to let the case go to the jury as to all defendants, and after verdict to exercise, if necessary, the discretion of the Court to prevent any miscarriage of justice.

The indictment charged a conspiracy involving many persons, not all indicted. The acts proved were often known to but a few of the defendants. Many of the acts were innocent enough on their face, so that a defendant knowing only what appeared on the surface, might easily have drawn no inference of violation of law from the mere knowledge of the facts shown. The whole activity of a large part of a great industry in a large section of the country was involved. Legal purchases of gasoline in the ordinary course of dealing and running into millions of dollars were being made, along with the purchases in a much smaller volume that the Government has charged the defendants with having illegally made in the furtherance of the conspiracy. Letters, telegrams, telephone conversations and intra-company memoranda were shown having strong probative force as to some defendants, yet the contents thereof were wholly unknown to others. Large corporations with national distribution of gasoline were committed to a course or policy by agents or officials in charge of one department, where it is not at all clear that the responsible executive in charge of the entire company ever had any knowledge that a small portion of purchases here complained of had been made as a result of this conspiracy. Circumstantial evidence was adduced which applied with great force as to some defendants, yet had no probative force as to others.

As to a defendant shown by direct and positive evidence to have been a party to the conspiracy, or where as to a defendant the circumstantial evidence, properly applied, meets the required degree of proof, it is of course proper to view the record as a composite whole. To apply that rule in cases where there was otherwise no proof or, at most, very slight proof, would be a complete reversal of the American idea of justice. All of the evidence must also be viewed in the light of special circumstances claimed to apply in individual cases.

That the jury was in a position to make the complete and critical study of the proof as it applied to each defendant separately is at least doubtful. It has taken the Court a considerable time to do it with the aid of the record and briefs. The jury, acting in an effort to do justice, did get the larger view of the case, and is to be commended for its handling of a most difficult problem.

While I am satisfied that as to some of the defendants, as hereinafter pointed out, the verdict must stand, I am equally satisfied that as to the defendants, Dan Moran, Henry M. Dawes, Edward G. Seubert, Allan Jackson, Bryan S. Reid, Frank Phillips, W. G. Skelly, Jacob France, Charles L. Jones, A. V. Bourque and The Globe Oil & Refining Company (Kansas), there is no substantial evidence in the record fairly tending to sustain the verdicts of the jury, and as to these defendants the verdicts will be set aside and the indictment dismissed.

It is so ordered and adjudged.

I am also satisfied that in the light of the proof as a whole, but applied individually in the light of special circumstances shown as to them, which it would be fruitless to review here but which appear in the various motions and briefs, there is good reason to believe that certain defendants have not had an adequate separate consideration of their defense, in view of the fact that as to some of them direct evidence of participation was lacking or slight, and the circumstantial evidence viewed as a whole may well have obscured other facts and circumstances shown, in some cases, to be highly suggestive of innocence, and in all cases entitled to be considered and weighed. Once the jury arrived at the conclusion that a conspiracy to fix prices had been in operation, defendants as to whom only circumstantial evidence had been offered were naturally at a serious disadvantage in being charged and tried along with large corporations and other individuals definitely shown to have engaged in the conspiracy. Men who were employed by large corporations may well have had harmful inferences drawn from the fact that their employers, the corporations, participated in the conspiracy.

For these reasons and for many particular reasons set out in the motions and briefs, the verdicts will be set aside and a new trial granted to these defendants, and it is, therefore,

Ordered and adjudged that the verdicts as to defendants, Edward J. Bullock, A. G. Maguire, Harry D. Frueauff, H. E. Brandli,

O. J. Tuttle, Harry J. Kennedy, C. B. Watson, J. W. Carnes, Edward L. Shea, Noel Robinson, J. W. Warner, E. B. Reeser, I. A. O'Shaughnessy, A. M. Hughes, Alexander Fraser, Cities Service Company, Barnsdall Refining Corporation, and Standard Oil Company (Indiana), be set aside, and said defendants are hereby granted a new trial.

Coming now to the remaining defendants tried and not heretofore disposed of, the indictment charges in general substance that the defendant major oil companies, acting through the defendant officers and others not indicted, formulated and carried into effect an unlawful conspiracy to fix prices of gasoline during a period from about March 1, 1935 to about August 1, 1936. The indictment sets out precisely the means by which the conspiracy was carried into effect, namely, two substantially simultaneous buying programs or pools, one in the so-called Mid-Continent field, and the other in the so-called East Texas field. The charge is that in each instance, for the purpose of artificially raising and fixing the price of gasoline at artificially high and non-competitive levels in the so-called spot tank car market and in the wholesale and retail market in the Standard of Indiana territory, the major oil companies conspired to and did, by concerted action and allotment, buy gasoline in large quantities from time to time, in the Mid-Continent area in that spot market and in the East Texas field through the East Texas Refiners' Association in that spot market, which gasoline was not required to meet the needs of the respective major companies at the time, and that this was done for the sole purpose of bringing about an arbitrary and controlled rise in prices of gasoline.

The indictment further charges as a means of the execution thereof that the defendants conspired and designed through such buying to cause the higher and arbitrary and above-market prices at which they were buying to be reported to and printed in the market quotations of the Chicago Journal of Commerce, and in Platt's Oilgram, as though they were bona fide sales of gasoline by independent refiners in these two fields to their independent jobbers and consumer trade, concealing from the rest of the industry and the public the fact that such sales were being made of distress gasoline to major companies who were buying solely for the purpose of bringing about a rise in price. The indictment charges that the conspiracy was carried out by concerted action of the defendants, and that as a result, during the period involved, the defendants did bring about an arbitrary high and artificial price in the said spot market, and that these prices were in fact published as spot market prices, and that as a result the defendant major oil companies received, as they had planned in formulating the conspiracy, arbitrary and unfair prices and profits from the sale of their own products which constituted a very high percentage of the total distribution to jobbers and consumers in the so-called Standard of Indiana territory. It further charges that the conspiracy as thus formulated and executed enabled these major companies, through the concerted purchase of a very small percentage of the total available gasoline for distribution in the Standard of Indiana territory, to raise the price to controlled levels and thereby unreasonably and unlawfully to profit on the sale of their own products.

The defendants contend that at and immediately prior to the commencement of the concerted program in the Mid-Continent field, the industry was suffering from serious abuses and bad trade practices which it was not only lawful for the defendants to correct by concerted action, but that such correction was imperative if conditions of free and healthy competition in the industry were to be preserved at all; that the spot tank car price from November, 1934 and through February of 1935, and immediately prior to the commencement of the buying program in the Mid-Continent field, was ruinously low; that had not prompt and immediate steps been taken to alleviate this condition, the independent refiners would have been bankrupt very shortly, and the industry deprived of any independent competition in that field; that even the majors were sustaining tremendous losses as a result of the ruinous price. That another cause of the disastrous situation of the industry at the time was the production of unlawful crude and of gasoline unlawfully manufactured therefrom, called in the industry "hot oil", and that this had been a heavily contributing factor in bringing about, over a long period of time, an over supply of crude and thus of gasoline. That the independent refiners were almost without exception poorly capitalized, had not the means with which to supply or acquire storage facilities which would enable them to hold their manufactured product more than a very brief period

of time, and that they were thus not in a position to hold their product awaiting seasonable demand or better markets, but on the contrary were under the necessity of making a substantially immediate disposition of all of their products, over and above their current market sales to regular customers, at whatever price they could obtain, and this was usually well below the market price. That the independent refiners could not cut down their supply of crude, being obligated to take the entire output of their various sources of crude or lose those sources entirely. That buyers among independent jobbers, distributors and the major companies were taking full advantage of this situation, and that this excess gasoline over and above what the independents could sell to their regular trade, and which was called in the trade "distress gasoline", heavily overhung the market, depressed it well below the cost of production, and constituted a serious unfair trade practice and condition which the defendants were fully justified in seeking to remove by concerted action. That concerted action in that behalf was not only lawful, but in the public interest, and calculated to restore and preserve a healthy competition among independent refiners with the major companies, and to bring about for the industry only a fair, reasonable and normal profit upon its manufacturing processes; and that it was entirely legitimate for the major companies to seek the incidental benefit to themselves therefrom resulting. That this situation as to distress gasoline had been the subject and object of Government investigation and efforts for its removal over a considerable period of time prior to the commencement of the buying program in the Mid-Continent field; that their objective in this program was to bring about only such a rise in the spot tank car price as would bring the price of gasoline onto a parity basis with its raw material, crude, and thus enable the industry to recover the cost of manufacture and a normal, healthy profit; that the Government itself had fixed a fair parity ratio between gasoline and crude at 18½ to 1, and that the price of crude was "pegged" by the Government at $1 per barrel, and that the price of gasoline in the spot tank car market in the period in question never at any time exceeded the parity basis. That the attainment of a parity basis between gasoline and crude had been and was a Governmental objective over some considerable period of time prior to the inception of the

buying program in the Mid-Continent field. That the concerted action in the Mid-Continent field was taken under the authority of the code for the petroleum industry set up under the National Industrial Recovery Act, and that when the latter had ceased to be in effect, the program was continued with the knowledge of responsible officers of the Government in authority in connection with the petroleum industry. That while there undoubtedly was a buying program in the Mid-Continent field, this did not go at any time beyond a purely voluntary program under which no major company made any commitment to buy at all, no commitment to buy any particular quantity, and no commitment to pay any particular price. That the program consisted of assembling accurate and dependable information as to the location of and amounts of distress gasoline in the hands of independent refiners from time to time, and imparting this knowledge to the major companies who were committed to the general program of removing this gasoline at fair but not higher than market prices. That at all times each of the major companies bought in the light of this information, considering a price which had been recommended but was not at all binding, and that such company, in making purchases, dealt directly with the independent refiner, and made its own bargain and price, and was free at any time to buy or not to buy, as it saw fit, and that there was never any commitment or promise involved in the program. That the arrangement by which each major company operating in the Mid-Continent field is claimed to have assumed responsibility for absorbing or buying the surplus or distress gasoline of one or more independent refiners, called in the program "dancing partner", was one for convenience only, and was a reasonable and fair method of providing for the orderly marketing of distress gasoline. That had not this been done, the buying would have been haphazard, with some independent refiners not disposing of their surplus and others having greater demands than they could meet. That in the Mid-Continent field another evil practice which they sought to remove was that certain independent refiners were better known than others, and could dispose of their product more readily, with the result that they were running more than their fair share of gasoline, while certain other independents, less known, had difficulty in disposing of a fair amount of gasoline, and that the bringing together of a major with

its "dancing partner" or partners, was calculated to even up and equalize that situation, and was one which was calculated for the good of the industry, but was not for the benefit of the major companies in particular. That the published prices of sales in the trade journals were actual sales of independent refiners to their independent jobber or consumer customers arrived at in a free and competitive market, and that on no occasion was the sale of gasoline to a major company published as the spot tank car market price. That the major companies did not, in fact, buy gasoline in excess of their legitimate needs and requirements. That taking into consideration their current demand, impending seasonal demands, expected improvement in general economic conditions, and the impending enforcement of the Connally Act, 15 U.S. C.A. § 715 et seq., their buying was no more than reasonable, prudent buying for such needs and reasonable inventories. That there was never any buying program or concerted arrangement of any kind in the East Texas field so far as the major oil companies were concerned. That the independent refiners themselves organized a central selling agency to market their distress gasoline. That the independent refiners in East Texas had brought about much of their difficulty and distress by reason of their purchase of unlawfully produced crude, and the manufacturing of the same into unlawful gasoline, or, in other words, they were dealing in "hot oil", and further that this group of refiners had not been found dependable by the industry in respect to the quality or uniformity of their product; that the association was formed by these independent refiners for the purpose of bringing about a condition in which these refiners could make it known to the industry that they had desisted from these bad practices and had become a dependable group with whom majors could safely deal, and that it was an effort to overcome resistance on the part of the majors against buying from this group of refiners which caused the association to be formed. That the entire East Texas program consisted of an effort by the East Texas Association to induce major companies to buy distress gasoline of the members of the association through the association, and that the majors never entered into any concert or agreement of any kind or undertaking with reference thereto, and that the sales of gasoline made through the association consist of two groups: (a) Purchases by majors who had always bought in East Texas but who had no part in any concerted action or program; (b) Purchases by majors who may or may not have been purchasing in East Texas regularly, but independent purchases made as a result of the direct solicitation by the East Texas Marketing Association; and that in each case every sale was an independent, isolated transaction involving no concert or agreement with major companies. That such buying as was done by major companies in East Texas was in the light of actual requirements, and that the evidence as to amounts of purchases by various companies and time of purchase discloses that there could have been no allocation or arrangement between the majors. That through the period only a few purchases of a very small percentage of the total were made at above the low price of the spot tank car market; that a much higher percentage was purchased at the low of that market; and that a majority of the purchases in amount was at from ¼ to ½ cent under the low of the spot tank car market; that these activities were not calculated or intended to and did not bring about an unreasonable price; that the circumstance that the price leveled off from June, 1935 through December, 1935 was a natural and frequently recurring condition in the industry under healthy, normal competitive conditions; that the rise of one-half cent in January, 1936 resulted naturally from a corresponding rise in the price of crude at that time, and was not the result of concerted action on the part of the defendants. That the program in the Mid-Continent field was conducted openly, publicly and with full knowledge of all the trade, independent and major companies alike, and with the knowledge of responsible Government officials. That at no time was the open and free competition in the spot tank car market destroyed or impaired; that the spot market was at all times a free, open, and fully competitive market; that if the buying program had a psychological effect upon the independent refiners tending to make them more firm in their demands for price, such effect was not sufficient to make them unreasonable for the reason that the program never went more than from week to week, and that there was never any commitment or assurance that it would last beyond the current week. That in spite of the fact that the major companies distribute something in excess of 75% of the gasoline in the Standard of Indiana territory, there never has been a time and there was not a

time during the continuance of this program when the major companies were in fact able to control the market, and that even if a group of major companies raise the price, unless the independents follow, the efforts of the majors are fruitless, and they are compelled to restore the former price, and that as a matter of fact they did not among them have the power to control the market. That upon the record there was no substantial evidence to go to the jury as to whether or not the efforts of the defendants were effectual in controlling the price of gasoline as charged in the indictment, or to what extent, if any, the rise in the market price resulted from such activities, as distinguished from other factors then operating, such as enforcement of restrictions on shipments of illegally produced crude under the Connally Act, the natural economic recovery, and the seasonal recovery; and that these latter factors were largely, if not entirely, responsible for the rise in price which took place; that there was no evidence in the record that the portion of the rise in price which could be attributed to the activities of the defendants was unreasonable or unreasonably attained. That the price achieved in the buying movement conceded to have existed in the Mid-Continent field, and the result achieved in East Texas, whether with or without concert, was only a price which was on a parity with the price of crude. That the price was entirely reasonable, and that it is, under the doctrine of the Appalachian Coals, Inc., Case, Appalachian Coals, Inc., v. U. S., 288 U.S. 344, 53 S. Ct. 471, 77 L.Ed. 825, no violation of the Sherman Anti-trust law for individuals or corporations engaged in an industry to get together on a reasonable program calculated to eliminate certain abuses that have grown up in that industry, and that they have not in this case exceeded the limits of what was held in that case to be lawful.

The foregoing are most of the contentions of the defendants, some of which are supported by the evidence.

The theory upon which the Government tried this case is grounded upon the Trenton Potteries Case, U. S. v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989.

The Government admits that while there were abuses involved in the nature of bad practices, nevertheless the motivating purpose of the defendants was not the alleviation of this condition, but the arbitrary raising and fixing of prices. It contends that the price attained and the progressive rises in price between March and June, 1935, were in effect "rigged" or controlled prices brought about by the defendant major companies for their own benefit and profit. It concedes that unlawful or "hot" oil had been a factor in bringing about unfair prices, but contends that the passage of the Connally Act and the enforcement of its provisions would naturally have brought about a normal and healthy price level without the intervention of the defendants, and that the defendants knew that circumstance, but nevertheless went ahead bringing about progressive rises in price which they were able to predict to a fraction of a cent each time, showing that the market was actually a controlled market. That the arrangement by which prices were suggested and the various major companies were assigned one or more independent refiners called "dancing partners" amounted to even more than a conspiracy among major buyers and, in fact, included independent sellers, and this for the very purpose of making certain that the market would be under control. That while the buying program in the Mid-Continent field originated at a time when the Petroleum Code was still in effect, that it nevertheless went beyond the authority given by governmental officers for the alleviation of the conditions of distress gasoline, and then when the code ceased to be in effect, the defendants continued the program, well knowing that it then had no color of legality. That while there is testimony tending to show that the action was voluntary, and that while no commitments were made and nobody was obligated to buy or to pay any particular price, the course of conduct of the defendants in the buying indicates the contrary, and that they did in fact absorb this surplus gasoline pursuant to a concerted arrangement. That the fact that the allocation between the defendants bore no relation to their production or distribution or to the apparent equities of the situation, was another part of the scheme to camouflage the operation and make it appear to be one without concert, but that the references to East Texas movement in the testimony and documentary evidence are adequate and competent to show that it was in fact an action concerted between the defendants. That the leveling off of

prices from June, 1935 to December, 1935 is evidence of the circumstance that the defendants had the market price under control, and that the price rise of one-half cent in January, 1936 was purely arbitrary, against seasonal demand, at a time when public buying was at a low ebb, inventories entirely adequate, and that the advance in the price of crude was manipulated and controlled by the defendants. That while the purchases of the defendants were for the most part at the low or slightly under the low of the market, the fact is that the independent refiners could rely upon this buying program for their distress gasoline, which put them in a position to demand higher prices with confidence, and that while the major buying appeared to follow rather than lead the market, in fact it was the stimulating and activating cause of the repeated rises in market price between March, 1935 and June, 1935, and of the further rise in January of 1936.

The Government contends that there is ample proof in the record that the buying programs were the activating and efficient cause of the price rises, that the market was under the control of the defendants, that the repeated rises did, in fact, result from the activities of the defendants in the two buying programs, as charged in the indictment.

The evidence was, in general, in conflict. It does appear without dispute that a concerted buying movement took place in the Mid-Continent field. Its character was in dispute. If the program was aimed at price fixing as such, it is sufficient that it was artificial and controlled. I am satisfied that there was ample evidence to take the case to the jury on these issues as well as on the issue of whether or not there was a concerted program in East Texas, and as to its character. While that program took an outward form and appearance of a sellers' program, there were facts and circumstances substantiating the claim of the Government that it was in fact a program devised and maintained by the defendants, which the jury had a right to believe.

There were proofs sufficient to sustain the verdict as to the allegations in the indictment that the defendants were able to and did effectually tie the jobbers' price in the Standard of Indiana territory, which includes the Western District of Wisconsin, to the tank car price in the spot market, and so to the artificial price the jury found the defendants brought about.

It is claimed by the defendants that they did not have the power to control the price as charged, and that inasmuch as some of the large companies did not or have not been shown to have participated in the movement, the power of the defendants in that respect was inadequate for the purpose. This does not follow, for the reason that large buyers both in East Texas and in the Mid-Continent fields, while acting separately, were nevertheless buying for their requirements in these fields, as they had always done and as defendants had every reason to believe they would continue to do. The defendants were thus able to consider that these buyings would necessarily reduce the available gasoline which they proposed to take off the market just as effectively as though these other companies had joined in the program. The amount of distress gasoline would be exactly the same in any event, and the proof shows that the surplus was in fact a very small part of the total, so much so that most of the defendants have shown that its acquisition in addition to other buying did not materially increase their inventories. I am satisfied that there was ample evidence to sustain the contention of the Government that the defendants did have the power to control the market, and that they did so, as charged.

There was, in my view, evidence to go to the jury and to sustain its verdict as to every essential charge in the indictment as to the defendants, Charles E. Arnott, P. E. Lakin, H. T. Ashton, Robert W. McDowell, R. H. McElroy, Jr., Socony-Vacuum Oil Company, Inc., Wadhams Oil Company, Empire Oil and Refining Company, Continental Oil Company, The Pure Oil Company, Shell Petroleum Corporation, Sinclair Refining Company, Mid-Continent Petroleum Corporation, Phillips Petroleum Corporation, Skelly Oil Company, The Globe Oil & Refining Company (Illinois), and The Globe Oil & Refining Company (Oklahoma). The jury's verdicts as to these defendants will be sustained, and

It is ordered and adjudged that the motions of said defendants for an order setting aside the verdicts and for a new trial be and they are hereby denied, to all of which the said defendants may each have an exception.