## WHOLESALE DRY GOODS INSTITUTE, Inc., et al. v. FEDERAL TRADE COMMISSION.

### No. 3.

Circuit Court of Appeals, Second Circuit.

Nov. 15, 1943.

Writ of Certiorari Denied Feb. 7, 1944.

See 64 S.Ct. 528.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

Charles H. Tuttle, of New York City, for petitioners.

Everette MacIntyre, of Washington, D. C., for respondent.

PER CURIAM.

The Supreme Court held in Eastern States Retail Lumber Dealers Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788, that retailers who combined not to buy of such jobbers as sold direct to the consumer, were within the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, and that it was no excuse "that the course pursued is necessary to the protection of the retail trade and promotive of the public welfare in providing retail facilities". 234 U.S. at page 613, 34 S.Ct. at page 954, 58 L.Ed. 1490, L.R.A. 1915A, 788. There as here the combination was covert, disguised as an interchange of information, whose purpose was innocent; a circumstance which the court naturally, and indeed inevitably, treated as irrelevant, if the agreement peered through the mask. Nothing which has followed has qualified that ruling; it remains true, now as it was then, that such a combination is unlawful no matter how pressing may be the evils which it is designed to correct, and which indeed it may in fact correct; as in the case of the combination to fix prices, nothing will justify it. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. Of the wisdom of so depriving an industry of such means of self-help we have nothing to say; indeed, we have no acquaintance with the subject-matter which would warrant any opinion; once we have ascertained whether in the case at bar there was evidence of such agreement, our function ends.

The petitioner, as we understand it, challenges the continued authority of Eastern States Retail Lumber Dealers Ass'n v. United States, supra, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788, thinking it overruled, or at any rate modified, by Maple Flooring Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093; Cement Manufacturers Protective Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104; and Appalachian Coals, Inc., v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825. In the first of these cases—it is not necessary to deal separately with the second—an association collected, and passed about, trade information as to prices, supply and production among the members, which, as the court recognized (268 U.S. at page 585, 45 S.Ct. at page 585), might have been used to fix prices or otherwise to restrict competition, and which a minority of the court thought had been in fact collected for those purposes. However, upon a review of all the evidence the majority found that there was no such understanding between the members; and the decision really comes to no more than that a trade association may lawfully exchange general trade information, if in fact that is not a fetch or cover for a combination to control the market. Nothing said in either opinion indicates a disposition to overrule Eastern States Retail Lumber Dealers Ass'n v. United States, supra, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R. A.1915A, 788. In Appalachian Coals, Inc., v. United States, supra, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825, there were indeed expressions (288 U.S. at page 374, 53 S.Ct. at page 479, 77 L.Ed. 825) seeming to

indicate that the correction of evils existing in an industry might justify an agreement fixing prices; yet when the whole opinion is read, it appears that the court relied rather upon the fact that the combination controlled too little of the supply really to affect the price of coal (288 U.S. at page 373, 53 S.Ct. at page 479, 77 L.Ed. 825); and—what was perhaps the same thing in another form—that, in spite of the very substantial percentage of the "Appalachian territory" occupied by the parties, the market to which they had to resort was far wider (288 U.S. at page 376, 53 S.Ct. at page 480, 77 L.Ed. 825); so wide that their combination could not prejudice the public. Moreover, whatever may be thought of the implications to be drawn from that decision, the court very positively held in United States v. Socony-Vacuum Oil Co., supra, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, that price fixing agreements of every kind are forbidden, and admit of no excuse. So far, therefore, as an agreement of the kind here at bar may be thought to be parallel to a price-fixing agreement—the only assumption on which Appalachian Coals, Inc., v. United States, supra, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825, can be relevant at all—the present state of the decisions gives no countenance to the notion that the doctrine of Eastern States Retail Lumber Dealers Ass'n v. United States, supra, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788, has been relaxed. If the Commission had before it evidence enough to support its finding that a combination existed not to buy of manufacturers who dealt with retailers on the same terms on which they dealt with wholesalers, its order was unquestionably right.

The report of the "Differential Committee" of 1930, standing alone, really lends itself to no other conclusion; the scarcely veiled purpose of the whole scheme was patently to prevent manufacturers from dealing directly with retailers. The information exchanged could have had no other use to wholesalers, unlike information as to current, or past, prices, supply and production. There was no action which they could take upon it except to blacklist a manufacturer who would not adhere to the project. Indeed, the only intimation of excuse we can find is that they might learn whom they could "profitably" deal with. If that meant those who by their loyalty would prove in the end profitable to the wholesale trade, it confesses the charge; if it meant that disloyal manufacturers would in general be untrustworthy persons to deal with, it is irrelevant. The restriction being itself unlawful, disregard of it could not lawfully be made an occasion for imposing it upon the pretence that truants were in general morally unfit. That would be to secure compliance indirectly with that which could not be directly enforced. We must not be fobbed off with pious protestations, when the design is so clear. And if it had not been, the later conduct of the association would have left no room for debate. The instructions to buyers, the vote at the general meeting, the Dykstra episode—to take one instance—: each of these alone leave no doubt as to the real understanding. Not only was there "substantial evidence" to support the findings, but it is impossible to see how any fair tribunal could have come to another conclusion.

Order affirmed.