UNITED STATES of America,
Plaintiff,

v.

GREATER BLOUSE, SKIRT & NECK-WEAR CONTRACTORS' ASSOCIA-TION, INC., National Association of Blouse Manufacturers, Inc., Slate Belt Apparel Contractors' Association, Inc., Blouse and Waistmakers' Union Local 25, International Ladies' Garment Workers' Union, James Clemenza, a/k/a Jimmy Brown, I. Lloyd Cabin, Charles Kreindler, Abraham Rosenthal, Harry Strasser, Defendants.

United States District Court
S. D. New York.

Sept. 8, 1959.

Richard B. O'Donnell, New York City, Atty., Dept. of Justice, for plaintiff.

Milton J. Levy, New York City, for defendants Greater Blouse, Skirt & Neckwear Contractors' Ass'n, Inc., James Clemenza and I. Lloyd Cabin.

Amen, Weisman & Butler, New York City, for defendant National Ass'n of Blouse Mfrs., Inc.

Herbert Brownell, Jr., New York City, for defendant Slate Belt Apparel Contractors' Ass'n, Inc. Lord, Day & Lord, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Blouse & Waistmakers' Union Local 25, International Ladies' Garment Workers' Union and Charles Kreindler.

Julian Liberman, New York City, for defendant Abraham Rosenthal.

Brower, Brill & Gangel, New York City, for defendant Harry Strasser.

DIMOCK, District Judge.

These are motions by all defendants in a criminal antitrust case in which three associations, one labor union and five individuals are charged with violations of sections 1 and 2 of the Sherman Act, 26 Stat. 209, 15 U.S.C. §§ 1, 2, in the production of ladies' blouses in a four-state area.

Defendant Strasser moves under Rule 12, F.R.Crim.P., for dismissal of the indictment. All of the defendants, with the exception of defendant Strasser, move under Rule 14, F.R.Crim.P., for relief from an alleged prejudicial joinder of defendant Strasser, and, under Rules 16 and 17(c), F.R.Crim.P., for inspection and production of various documents in the Government's possession. All of the defendants move under Rule 7(f), F.R. Crim.P. for extensive bills of particulars. Finally, defendants ask leave to make further motions with respect to this indictment, after the Government's compliance with any requirements of this decision concerning bills of particulars and discovery and inspection, and at any time before trial. Each motion is opposed by the Government.

The indictment, in count 1, charges that defendants, and other co-conspirators not named as defendants, engaged in an unlawful combination and conspiracy, in restraint of interstate trade and commerce, in count 2 that they engaged in an unlawful combination to monopolize interstate trade and commerce, and in count 3 that they engaged in an attempt to monopolize interstate trade and commerce.

Named as defendants are the following:

Greater Blouse, Skirt & Neckwear Contractors Association, Inc. (hereinafter Greater), a New York corporation, claimed to be "an association whose members are contractors who produce, among other things, ladies' blouses and do business in New York, New Jersey, Pennsylvania and Connecticut;"

Slate Belt Apparel Contractors' Association, Inc. (hereinafter Slate Belt), a Pennsylvania corporation, also claimed to be "an association whose members are contractors who produce ladies' blouses" and who do business in Pennsylvania and New York;

National Association of Blouse Manufacturers, Inc. (hereinafter National), a New York corporation, claimed to be "an association whose members are manufacturers or jobbers of ladies' blouses doing business in New York, New York";

Blouse and Waistmakers' Union, Local 25, International Ladies' Garment Workers' Union (hereinafter Local 25), claimed to be "a voluntary association, organized and existing under the laws of the State of New York" whose membership "consists of workers engaged in the production of ladies' blouses";

James Clemenza, employed by Greater since 1953 and its Executive Director since 1957;

I. Lloyd Cabin, alleged to have been "associated with either Greater or Slate Belt in an executive capacity" during the entire period of the indictment;

Charles Kreindler, alleged to have been the "Manager of Local 25 and a vice president of the International Ladies' Garment Workers' Union" during the entire period covered by this indictment;

Abraham Rosenthal, claimed to have been president of National from in or about 1949, the beginning of the period covered by this indictment, to November 1950 and from November 1952 to September 1956;

Harry Strasser.

The indictment charges the following:

In the ladies' blouse industry the term "contractor" refers to persons, firms or corporations "engaged in the business of producing ladies' blouses from uncut or cut material owned by the jobber or manufacturer for whom such person, firm or corporation is producing those blouses." A contractor, it is alleged, "owns the means of producing such blouses, hires labor and takes the risk of profit or loss in the conduct of his business." The terms "jobber" and "manufacturer" refer to a person, firm or corporation "engaged primarily in the business of selling ladies' blouses at wholesale, and who has some or all of those blouses produced by contractors."

"33. The aforesaid combination and conspiracy has consisted of a continuing agreement and concert of action among the defendants and co-conspirators, the substantial terms of which have been and

are to: fix the prices the members of National would be required to pay to members of Greater and Slate Belt for blouse contracting work; allocate the blouse contracting work of members of National among the members of Greater and Slate Belt; require members of National to use members of Greater and Slate Belt exclusively to do blouse contracting work; establish a policing and enforcing system to prevent violations of the conspiracy; impose penalties or damages for violations of the conspiracy; and require manufacturers and jobbers of ladies blouses who were not members of National either to join National or to conform to the aforesaid terms of the conspiracy.

"34. During the period covered by the indictment the said combination and conspiracy has been effectuated by various means and methods including, among others, the following:

"(1) In 1949 Slate Belt was formed by a group of contractors in Pennsylvania. Late that year, some time in October, Slate Belt affiliated with Greater. Under their affiliation agreement, Slate Belt's members became members of Greater. And Slate Belt was bound by all agreements made, or to be made, by Greater with Local 25 and National.

"(2) At about the same time, Greater, National and Local 25 evolved a plan to stabilize the blouse industry in New York, Pennsylvania, New Jersey and Connecticut. Carrying out this plan, Greater and National entered into an agreement in 1950 under the terms of which (1) prices to be paid contractors were fixed; (2) blouse contracting work of the members of National was allocated among the members of Greater and Slate Belt; (3) members of National were required to give their contracting work exclusively to members of Greater and Slate Belt; (4) members of Greater and Slate Belt were required to work exclusively for members of National; (5) an enforcement system through an industry Impartial Chairman was established.

"(3) In conjunction with the Greater-National agreement, Local 25 entered into separate agreements with National and Greater. These agreements provided that blouse contracting work of members of National was to be allocated among the members of Greater and Slate Belt; penalties were to be imposed upon members of National for violation of the allocation system; and an enforcement system was promulgated utilizing the same industry Impartial Chairman named in the Greater-National agreement.

"(4) All the above described agreements were in effect during the period 1950 through 1952. And during such period, Local 25 and National conducted a campaign to force non-member jobbers and manufacturers either to join National or to conform substantially with the terms of the Greater-National agreement. The Greater-National-Local 25-Slate Belt arrangements continued through 1952.

"(5) In 1953, however, Slate Belt, dissatisfied with its alliance with Greater, broke away from Greater. Slate Belt then entered into independent agreements with National and with locals of the ILGWU located in Pennsylvania. Slate Belt's agreement with National provided for a continuation of an allocation system, but it substantially changed the price fixing provisions of the 1950 Greater-National agreement. Greater also entered into separate contracts with National and with Local 25 providing for a continuation of an allocation scheme, but its new agreement with National also substantially changed the price fixing provisions of the 1950 Greater-National agreement. In this same period, National entered into an agreement with Local 25 continuing the allocation scheme specified in the 1950 National-Local 25 agreement. All of the 1953 agreements were to expire in late 1955 or early 1956.

"(6) In 1955, some months before these agreements were to expire, coconspirator Northeast Department, ILGWU, refused to renew Slate Belt's

independent agreements with its Pennsylvania locals. Slate Belt was informed that there would be only one union contract governing the contractors in the blouse industry, namely one between Local 25 and Greater. Thereafter, in the fall of 1955, Slate Belt again entered into a contract with Greater under which Slate Belt was bound by all agreements made, or to be made, by Greater with Local 25 and National. Defendant Harry Strasser, who had no apparent connection with the ladies' blouse industry, was instrumental in arranging Slate Belt's reaffiliation with Greater.

"(7) Following the rejoining of Greater and Slate Belt, Greater and National entered into negotiations for a new contract to replace the 1953 agreements which were to expire in early 1956. However, a dispute arose between Greater and National concerning the prices members of National would pay to members of Greater and Slate Belt for blouse contracting work, and the manner of fixing such prices. Defendant Harry Strasser played a major role in the settlement of this dispute. Growing out of this settlement Greater and National entered into an agreement which, among other things, provided for an effective system of price fixing, allocation of the blouse contracting work of National's members among the members of Greater and Slate Belt, and a requirement that members of National give their blouse contracting work exclusively to members of Greater and Slate Belt. Contemporaneously, Local 25 entered into agreements with Greater and National providing, among other things, for allocation of the blouse contracting work of National's members among the members of Greater and Slate Belt.

"(8) The 1956 agreements referred to above were effective at least until December 31, 1958. During this period organized policing of the industry was carried out by Greater, Local 25 and Slate Belt to enforce the price fixing and allocation provisions of the agreements. One of the results of this policing activity was that members of National, who contracted to have blouses made by members of Greater and Slate Belt at prices below those fixed in the 1956 Greater-National agreement, and without the prior approval of Greater and National, were forced to pay additional monies to the members of Greater and Slate Belt.

"35. The combination and conspiracy hereinbefore alleged has had the following effects, among others:

"Manufacturers and jobbers of ladies blouses belonging to National have had to pay higher prices to the contractors—members of Greater and Slate Belt.

"Manufacturers and jobbers of ladies blouses belonging to National have not been able to work with contractors of their own choosing.

"Manufacturers and jobbers of ladies blouses belonging to National have not been able to distribute their work among contractors in the manner they desired.

"Manufacturers and jobbers of ladies blouses, not members of National, have been brought into the conspiracy or made to abide by its terms.

"Contractors producing ladies blouses, not members of Greater or Slate Belt, have been deprived of an opportunity to work for members of National.

"Competition among contractors belonging to Greater and Slate Belt has been eliminated."

Paragraph 33 is made applicable to counts 1 and 2 and paragraphs 34 and 35 are made applicable to all three counts. The following discussion will deal with these motions in the order in which they were set forth at the outset of this opinion.

### I. Defendant Strasser's Motion for Dismissal of the Indictment.

Defendant Strasser attacks the legal sufficiency of the indictment on the grounds (1) that it "is fatally defective in that it has failed to alleged an essential ingredient of the offense, namely, 'injury to the public'", (2) that "it is too vague and uncertain to inform defendant of the charge against him", and

(3) that "all three counts are duplicitous."

Strasser expands his first contention to say that the indictment is defective because it fails to allege that the purpose or effect of the conspiracy was to raise or fix the market price or to cause harm to the consuming public. He says that the Supreme Court has said "in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price." Apex Hosiery Co. v. Leader, 310 U.S. 469, 500, 60 S.Ct. 982, 996, 84 L.Ed. 1311. He also cites Appalachian Coals, Inc. v. United States, 288 U.S. 344, 360, 53 S.Ct. 471, 474, 77 L.Ed. 825, for the proposition that the "mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it." The argument is that the Sherman Act condemns restraints upon competition only when their purpose or effect is to raise or fix the market price or result in harm to the consuming public, that proof of such purpose or effect is therefore essential to sustain a charge of violation, and that since there was no such allegation in the indictment the indictment is insufficient. Strasser's view of the elements necessary to sustain a Sherman Act violation is incorrect. The Supreme Court, in the Apex Hosiery Co. case, did indeed make the statement quoted above as to the necessity of effect on market price but that court has since limited its application in a case which also repudiated the requirement of public injury.

In the recent case of Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741, a retail seller of household appliances brought an action for treble damages and an injunction against a chain of department stores and ten national manufacturers and their distributors claiming that the defendants conspired to restrain and monopolize commerce by agreeing among themselves either not to sell to plaintiff or "to sell to it only at discriminatory prices and highly unfavorable terms." 359 U.S. at page 209, 79 S.Ct. at page 708.

The defendants sought summary judgment and dismissal of the complaint for failure to state a cause of action, alleging that there were hundreds of other household appliance retailers selling the items which defendants refused to sell to plaintiff and arguing that the agreement of the defendants did not injure the public. The District Court dismissed the complaint and entered summary judgment for defendants on the ground that this "purely private quarrel" did not amount to a "public wrong proscribed by the [Sherman] Act." The Ninth Circuit affirmed, stating that "a violation of the Sherman Act requires conduct of defendants by which the public is or conceivably may be ultimately injured." 255 F.2d 214, 233. On review by the Supreme Court the judgment was reversed and the case remanded for trial. The court held that a group boycott, such as was there alleged, "is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy." The complaint failed to allege any effect on market prices but the court required that its pronouncement on that subject in the Apex Hosiery case "be considered in the light of the fact that the defendant in that case was a labor union." 359 U.S. at page 213, 79 S.Ct. at page 710, fn. 7. The complaint was therefore held to state a cause of action.

It is true that one of the defendants here is a labor union like the defendant in the Apex Hosiery case. That particular defendant has not joined in the motion to dismiss, however, so the question of its liability without an allegation of effect on market prices does not now arise. The indictment in this case alleges a group boycott like that in the Klor's case, or at least a concerted refusal by traders to deal with other traders which the Klor's opinion equates with group boycotts. Hence the indictment survives Strasser's motion to dismiss insofar as it is based on failure to allege effect on market prices or public injury.

 Strasser's second ground for dismissing the indictment, that it is too vague and uncertain to inform him of the charge against him, is also without merit. Rule 7(c), F.R.Crim.P., sets forth the requirements that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." These requirements have here been met. Strasser is named as a defendant and the "defendants" are charged with conspiracy and attempt to monopolize. There are allegations of sufficient facts to show an agreement among the defendants to acquire control and monopoly and to restrain trade in the manufacture and distribution of ladies blouses. There is no requirement that overt acts be charged in the indictment, Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232, nor is defendant entitled to know what evidence will be presented against him. Strasser apparently is under the impression that he is entitled to a detailed pleading of evidence since he argues that he is entitled to know what he did to effect the conspiracy, with whom he conspired, when or where he conspired or performed an act or acts in furtherance of the conspiracy, how the prices were agreed upon, the territories allocated, the agreements negotiated, the policing accomplished, and how the public was affected. The answers to all of these questions would involve disclosing the Government's evidence and such disclosure need not be made in an indictment.

It is true that Strasser, after being described as a defendant, is mentioned only twice by name in the indictment, but, to paraphrase the language of the court in Las Vegas Merchant Plumbers Ass'n v. United States, 9 Cir., 210 F.2d 732, 750, the charge against Strasser does not rest merely on these specific references.

 Strasser's final contention is that the indictment must be dismissed because all three counts are duplicitous. He argues that, although each count charges one conspiracy starting about 1949 and continuing up to and including the date of the return of the indictment, the terms of the indictment reveal that "several distinct agreements are alleged in each count rendering those counts duplicitous." It is true that the terms of the indictment do show that more than one agreement was involved, but this does not render the indictment duplicitous. The plan to stabilize the blouse industry is alleged to have been arrived at in 1949. The fact that Slate Belt, in 1953, broke away from Greater and entered into independent agreements with National and the ILGWU in no way detracts from the continuation of the conspiracy, nor does the realignment of Slate Belt with Greater in 1955 necessitate the conclusion that another separate conspiracy was then formed. It may be that Slate Belt withdrew from the conspiracy in 1953, but it does not necessarily follow that the conspiracy ended at that time. In 1955, when Slate Belt once more associated itself with Greater, this could have been merely an act in furtherance of the conspiracy from which Slate Belt never withdrew, or Slate Belt's rejoining the conspiracy which it had earlier abandoned. If it is the former, the conspiracy could well have continued from 1949 to the date of the return of the indictment, and the allegations in the indictment are sufficient. If the 1955 reassociation was a rejoining of a pre-existing conspiracy from which Slate Belt had withdrawn, the indictment still stands. "The rule is clear that one who joins an existing conspiracy takes it as it is, and is therefore held accountable for the prior conduct of co-conspirators." United States v. Sansone, 2 Cir., 231 F.2d 887, 893, certiorari denied 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500; United States v. Kessler, 2 Cir., 253 F.2d 290, 291.

 The charge in count 1 is a conspiracy to restrain trade, and the charge in count 2 is a conspiracy to monopolize. Each count alleges a single continuing conspiracy which need not be broken up into several conspiracies merely because there were other agreements entered in-

to in order to effectuate the conspiracy. A single conspiracy may even embrace several related conspiracies, Nye & Nissen v. United States, 9 Cir., 168 F.2d 846, 850, affirmed 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; United States v. Coplon, D.C.S.D.N.Y., 88 F.Supp. 912, 914, reversed on other grounds 2 Cir., 185 F.2d 629; although the agreement between Slate Belt and Greater may not necessarily have been a related conspiracy, as pointed out above. The allegations against defendant Strasser are quite clear and can provide ample protection against double jeopardy if that should be attempted.

Defendant Strasser's motion to dismiss the indictment is denied.

## II. Motions for Severance.

Defendants Local 25 and Kreindler have moved for a severance of defendant Strasser from themselves and the other defendants in the case, or, in the alternative, for a severance of the moving defendants from Strasser and the other defendants. Each of the other defendants has joined in this motion. The basis for the plea for the severance of Strasser is a claim of prejudice on account of unsavory company that he is alleged to keep. He allegedly has been closely connected with extremely notorious criminals and racketeers so that his participation in the trial would tar the defendants throughout the litigation because of the jury's abhorrence of racketeers. Local 25 claims, and not without justification, that because of the efforts of the International Ladies' Garment Workers' Union, the union members have come to enjoy a higher standard of living than they theretofore realized and the sweatshop has been largely eliminated and that Local 25 consequently enjoys a high reputation. Local 25 claims that Strasser has been brought into this case so that the Government could counteract the effect of this high reputation by proclaiming the case to be an assault on racketeering, as well as an attack on business arrangements alleged to violate the Sherman Act. It is because the suggestion of racketeering is present that Local 25 complains that it will not be able to receive a fair and unbiased verdict on the antitrust issues.

In support of its argument that this case is an attempt to convict a racketeer, Local 25 has attached to its affidavit articles which appeared in the city's leading newspapers on the day that the indictment was returned and the following day all of which highlighted the claim that Strasser had underworld connections. In each article there was a statement, attributed either to the Attorney General of the United States or to a Justice Department official, to the effect that the antitrust laws were now going to be used to attack racketeering and union abuses. Defendant claims that because of such publicity the Government has "sought to inject a prejudicial and irrelevant issue of 'racketeering' into the trial of an important antitrust controversy."

It is, of course, highly regrettable if the publicity surrounding the indictment stressed heavily facts which have no place in the case. I am, however, unable to say that defendants cannot receive a fair trial merely because of the publicity immediately following the indictment, limited in time to one evening and one morning. No case has been cited and none has been found where a severance has been granted because of prejudice against one of the defendants, in the absence of a highly inflammatory incriminating statement made by that defendant. Compare United States v. Lebron, 2 Cir., 222 F.2d 531, 535, certiorari denied 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774, with United States v. Haupt, 7 Cir., 136 F.2d 661, 673–674.

No defendant makes a stronger case for a severance than Local 25.

If a severance were granted, the necessity of relitigating the issues would prejudice the Government, particularly in view of the fact that an antitrust case so often takes a long time to try. In addition, the defendants at the second trial would have the advantage of knowing in

advance exactly what evidence the Government expected to offer against them.

The motions for a severance are denied.

### III. Motions under Rules 16 and 17(c).

All of the defendants, with the exception of defendant Strasser, have moved under Rules 16 and 17(c) for the relief hereinafter described.

1. Defendants Local 25 and Kreindler seek, under Rule 16, "to inspect and copy or photograph, all books, records, documents and papers relative to the indictment belonging to defendant Local 25 or defendant Kreindler or obtained by the Government by seizure or process", and, under Rule 17(c), "to inspect and copy or photograph, books, records, documents and papers designated in a subpoena duces tecum served on the plaintiff on May 14, 1959, to wit: all books, records, documents and papers that are relative to the indictment and of evidentiary character, other than those furnished by defendant Local 25 or defendant Kreindler to the Government and those obtained by the Government by seizure or process";

2. Defendant Slate Belt seeks, under Rule 16, "to inspect, make extracts from, copy or photograph any and all books, records, documents, minutes, reports, checks, check vouchers, check stubs or any other writing relative to the indictment heretofore obtained from others by or in the name of the Government from any source whatever", and, under Rule 17(c), "to inspect, make extracts from, copy or photograph any and all books, records, documents and papers described in a Subpoena Duces Tecum * * * which were obtained from any and all sources, persons, corporations, associations, or otherwise, and are in the custody and control of the Government or any of its attorneys or agents, which bear, tend to bear upon, or relate to each of the crimes alleged in the indictment, the means allegedly used to effectuate the same, and the consequences alleged therein to have resulted therefrom, and are

of an evidentiary character, excepting only such of the foregoing written material which defendant has been permitted to inspect or copy pursuant to an order granted in response to the request for relief [under Rule 16]";

3. Defendants Greater, Clemenza, and Cabin seek, under Rule 16:

"1. Corporate documents and reports, bulletins, minutes since January 1, 1949.

"2. Agreements, contracts, arrangements, correspondence, memoranda and writings relating to labor, contractors, manufacturers, jobbers or associations thereof, and

"3. All correspondence and other writings from January 1, 1953 relating to, (a) the manufacture, production and prices of blouses, (b) price schedules or agreements and requests or attempts to deviate therefrom, and (c) registration and designation of contractors, manufacturers or jobbers and attempts to deviate therefrom,

"4. All correspondence and other writing from January 1, 1950 relating to (a) enforcement, fines, sanctions, or other action; (b) disputes including proceedings before the Impartial Chairman and attempts to enforce his decisions; attempts or efforts to induce membership in any association or to adhere to its rules or practices,

"5. All books, records or documents showing (commencing January 1, 1953): membership lists, names, addresses, official capacity, and terms of the officers, records of income and disbursements and other financial arrangements."

and under Rule 17(c):

"all books, records, documents and papers obtained by Government counsel, other than those belonging to the said defendants or those obtained by the Government by seizure or process, which (a) are relative to or resulted in the indictment and (b) will be offered as evidence on the

trial of the defendants or any of them, under said indictment; excluding, however, documents heretofore obtained by said defendants, such as copies of agreements to which the defendant Greater Blouse is a party."

4. Defendants National and Rosenthal seek, under Rule 16:

"to inspect, make extracts from, copy or photograph any and all books, records, documents, minutes, reports, checks, check vouchers, check stubs, or any other writing heretofore obtained from others by seizure or process by or in the name of the United States of America from any source whatever, particularly such as were obtained by said seizure or process from any and all persons, corporations and organizations named herein as defendants or co-conspirators as well as from all other persons, corporations and organizations described but not named herein as co-conspirators which may in any way, degree or extent relate to, reflect or record acts, conduct, transactions, occasions, statements and payments referred to or alleged in the indictment which bear or tend to bear upon the public offenses alleged in Counts One, Two or Three, respectively, in the indictment, the means allegedly used to effectuate the alleged unlawful conspiracies and attempt and/or the consequences which are alleged to have resulted therefrom;"

and, under Rule 17(c):

"to inspect, make extracts from, copy or photograph any and all books, records, documents and papers described in a Subpoena Duces Tecum, a copy whereof is hereunto annexed, served on the United States Attorney and on said 'Attorneys, Department of Justice' on the 14th day of May, 1959, and which were obtained from any and all sources, persons, corporations, associations or otherwise and are in the custody and control of the United States of America or any of its said attorneys or agents which bear, tend to bear upon, or relate to each of the crimes alleged in the indictment, the names allegedly used to effectuate the same and the consequences alleged therein to have resulted therefrom, excepting only such of the foregoing written material, which said defendants have been permitted to inspect or copy pursuant to an Order granted in response to the request for relief under Rule 16."

■ I have deliberately included the text of these motions to indicate the broad and thorough exploration that defendants seek of all the documents in the possession of the Government. Merely because the motions seek broad discovery, however, it does not necessarily follow, as the Government argues, that they are designed to permit the oft-condemned fishing expedition. This case involves a conspiracy charge against nine defendants and it is essential in a case of this type that "each have an opportunity to examine before trial documents which may be introduced against him but which he has never before seen." United States v. Cohen, D.C.S.D.N.Y., 15 F.R.D. 269, 273.

■ I also reject the Government's argument that the practice of using Rule 17(c) as an additional means of discovery was "prohibited by the Supreme Court in Bowman Dairy Co. v. United States, 341 U.S. 214, 220, 71 S.Ct. 675, 95 L.Ed. 879." See United States v. Cohen, supra. As I read the Bowman Dairy case, "the Court reasoned that if a subpoena is directed towards a good-faith effort to obtain evidence there is no reason why such evidence may not be reached under Rule 17(c), even though not obtainable under Rule 16." United States v. Gross, D.C.S.D.N.Y., 24 F.R.D. 138, 140.

■ Rule 16 deals with inspection and copying of items "obtained from or belonging to the defendant or obtained from others by seizure or by process, upon a showing that the items sought

may be material to the preparation of [the] defense and that the request is reasonable." The right granted by this Rule is conditioned upon a showing of materiality and reasonableness. The right of discovery granted by Rule 17(c) deals with material "obtained by the Government by solicitation or voluntarily from third persons", see Bowman Dairy Co. v. United States, 341 U.S. at page 221, 71 S.Ct. at page 679, and "material which has been in the Government's possession from the time of its origin." United States v. Cohen, D.C.S.D.N.Y., 15 F.R.D. 269, 271, supra. Nevertheless all of the motions made under Rule 17(c) must be denied because of their dragnet character. As I said in the Cohen case at page 273, "If defendants insist upon proceeding with catch-all descriptions they must at least list the evidentiary documents that are available to them elsewhere and exclude them from those demanded of the United States Attorney." Here defendants must at least list the documents that are available to them which come within the classes mentioned in the indictment.

The motions of the defendants under Rule 16 ask for items that seem to fall within it except that the defendants have made no specific showing of materiality and reasonableness. The issue therefore is whether such a specific showing is always a prerequisite to discovery under Rule 16. I hold that it is not. In a case of this type, where the documents in the possession of the Government, obtained through seizure or process, are too numerous for the defendants to identify, it is impossible to make a showing that they are material and that the request is reasonable. This is especially true where the defendants may not even know what documentary proof the Government has in its possession and where most of the evidence offered at trial by the Government is likely to consist of such documentary proof. See Bowman Dairy Co. v. United States, 341 U.S. 214, 219, 71 S.Ct. 675, 678, supra, where the Supreme Court declared that Rule 16 gives "discovery as to documents and other materials otherwise beyond the reach of the defendants which, as in the instant case, might be numerous and difficult to identify."

I do not mean to say that merely because the Government obtained the documents in question by seizure or process they are therefore presumed to be material, cf. United States v. Parr, D.C. S.D.Tex., 17 F.R.D. 512, appeal dismissed 5 Cir., 225 F.2d 329, affirmed 351 U.S. 513, 76 S.Ct. 912, 100 L.Ed. 1377, since documents could be seized and prove immaterial to the charge in the indictment, but in an earlier motion in this case, when an order was entered impounding the documents obtained by subpoena, the Government conceded that the "papers, documents, books and records are essential for the preparation and trial of the above captioned cause." If these items were essential for the preparation of the prosecution's case they are surely material to the preparation of the defense. I also find that the request is reasonable since inspection by the defendants is the "only way the defendant[s] can reach such materials so as to inform [themselves]." Bowman Dairy Co. v. United States, 341 U.S. 214, 219, 71 S.Ct. 675, 678, supra.

The Government has offered "to produce all documents which it may use in the trial of this case" and argues that this is the maximum to which defendants are entitled. This argument, however, overlooks the fact that Rule 16 grants production and inspection of documents not merely to help a defendant understand the prosecution's case but to help the defendant in the preparation of his defense. The fact that much of the material consists of documents which belong to third parties whose interests may be adverse to the moving defendants is not persuasive for denying the motion. Many of these documents will be introduced at trial anyway, if they are relevant, and the fact that they were obtained by seizure or process would minimize any inference of voluntary aid to the Government. I also reject the Government's argument that much of the

material "could be of no practical value to the defendants in the preparation of their defense." Such a value judgment is one that should be made not by the prosecution but by the defendants alone. Of course, documents which bear no relation to the indictment or are privileged need not be produced.

The motion of defendant Slate Belt under Rule 16 requests items obtained from others both voluntarily and by seizure or process. Rule 16 cannot be used for the purpose of getting documents obtained from others voluntarily so that it will be granted only to the extent of documents obtained from others by seizure or process.

The motions under Rule 16 are granted except where specifically denied above. The motions under Rule 17(c) are denied.

### IV. Defendants' Motions for Bills of Particulars.

The nine defendants have made five separate motions for bills of particulars and the requests cover sixty-three legal pages. Many of the requests seek the detailed evidence which the Government will offer and the theory on which the case will be tried. On the other hand some of the requests are reasonable and seek particulars necessary for the preparation of the defense in view of the fact that the indictment covers ten years and involves thousands of people. The difficulty in ruling on such requests lies in the fact that the precedents furnish little help since each case must be judged by its special factual situation. The principles to be applied in a decision of this type have been well stated, see United States v. Aluminum Co. of America, D.C. S.D.N.Y., 41 F.Supp. 347, 348; United States v. Metropolitan Leather & Findings Ass'n, D.C.S.D.N.Y., 82 F.Supp. 449, 453, and I will attempt to balance the interest of the Government in non-disclosure of evidence against the interest of defendants in being able to prepare their defense.

I shall take up the motion of Local 25 and Kreindler. I shall here refer to the paragraphs in the indictment to which the requests are respectively addressed.

*Paragraph 15.* The names and addresses of the unnamed co-conspirators are asked. The indictment charges no specific acts by any unnamed conspirators and enough are named to identify the conspiracies.

*Paragraph 22.* These items are denied except for the item to which the Government consents. The paragraph to which these requests are addressed is purely descriptive, detailing the trade and commerce involved. It is clear without the further description which is asked.

*Paragraphs 26, 27, 28 and 29.* The Government agrees to furnish item 1 of paragraph 27 and item 1 of paragraph 28. The requested particulars as to periods of time are unnecessary since it is clear that the indictment here speaks only as of its date. Where the indictment alleges that National represents a majority of the jobbers, defendants are entitled to know how many jobbers the Government claims exist and how many it claims are represented by National. The allegation in paragraph 29 that certain contracts set the pattern for the labor contracts in the entire blouse industry is an important part of the indictment and defendants are entitled to a statement of the area referred to in the term "the entire blouse industry".

*Paragraph 32.* Item 1 requests particulars as to the identity of the persons who acted for each defendant and the periods of defendants' participation. These are proper and must be furnished.

The particulars requested under item 2 with respect to the character of the conspiracy as a series of separate conspiracies or a continuing one are furnished by paragraph 33 of the indictment, where it states that the combination and conspiracy has consisted of a continuing agreement and concert of action.

*Paragraph 33.* Defendants are entitled to the usual particulars with respect to an agreement as requested in items 1 and 2.

Item 3, however, asks not only for the perfectly proper substance of any implied agreement, but also asks for the identity of the acts or documents from which it was implied and the names of the persons who performed such acts. This seems to me to be a request for a statement of the direct evidence upon which the Government will rely as circumstantial evidence of an implied agreement. It is a clear case of a request for the opponent's evidence, and is denied.

Item 4 asks for a characterization of the continuing agreement as to whether it had any terms or purposes other than those set forth in the indictment. Defendants can determine the matter of terms from the written instruments or statements of the substance of oral agreements furnished in accordance with this memorandum. So far as purposes other than those set forth are concerned, the matter is unimportant. Item 4 is denied.

*Paragraph 34.* Item 1 is evidently a request for an expansion of the expression "among others" in the statement that the combination and conspiracy has been effectuated by various means and methods including, among others, the following: To grant this request would require the Government practically to turn over to defendants all of the Government's evidence in advance of trial. It is denied.

Item 2 asks with respect to each "agreement", "plan" and "contract" referred to in paragraph 34, all of the particulars asked with respect to the agreements referred to in paragraph 33 and this request under item 2 in paragraph 34 is disposed of as was the corresponding request with respect to paragraph 33.

Item 3 seems to be a duplication of material required by item 2 and is denied.

Item 4 seeks the parts of the various agreements which are in furtherance of the continuing agreement or concert of action alleged in paragraph 33. This request is denied on the authority of United States v. Cohen, D.C.S.D.N.Y., 113 F.

Supp. 955 and D.C., 15 F.R.D. 269, supra. This applies to both subdivisions (a) and (b).

Items 5 and 6 are not within the province of a bill of particulars. The particulars requested form no part of the Government's case.

Items 7(a) and 7(b) ask in substance for a specification of the ways, other than "negotiating, entering into and enforcing the agreements" to which Local 25 was a party, referred to in paragraph 34, in which defendants Local 25 and Kreindler participated in the alleged continuing agreement and concert of action. This is only another way of stating item 1 and is likewise denied.

Item 8(a) asks, with respect to the second subdivision of paragraph 34, a statement of means and methods by which an alleged plan to stabilize the blouse industry was evolved and, among other things, the act or acts by which defendants Greater, National and Local 25 are claimed to have participated in evolving the plan. The alleged plan to stabilize the blouse industry seems to me very much like an agreement and I think that defendants are entitled to the same information with respect to it that I have permitted in the case of the agreements referred to in paragraph 33 and the part of 34 thus far treated.

Item 8(b) asks for a statement of the prices to be paid the contractors which were fixed by the 1953 agreement referred to in paragraph 34 and the area in which each price was so fixed. Since a copy of the agreement must be furnished under a previous ruling of mine with respect to paragraph 34, an answer to item 8(b) would be a duplication.

Item 9 is unintelligible and is denied.

Items 10(a) and 10(b) are in substance the particulars as to the way in which defendants Local 25 and National conducted and participated in a "campaign" to force action by non-member jobbers and manufacturers. Such matters do not lend themselves to precise statement as do allegations as to agreements and, to require the particulars

asked, would force the Government to detail evidence which, presumably, would be largely circumstantial. They are denied.

Item 11 must be treated as was 8(b).

Items 12(a) and 12(b) must be treated as were items 10(a) and 10(b).

The allegations respecting defendant Strasser's participation are so general that I am disposed to take a more liberal attitude toward item 12(c). That requests a statement of where, when, how and by what act or acts and at whose request defendant Strasser "was instrumental" in arranging Slate Belt's re-affiliation with Greater. Such a statement, except for "at whose request" must be given. There is no allegation in the indictment that defendant Strasser acted at anyone's request.

Item 12(d) is denied for the same reason that prompted the denial of "at whose request".

Item 13(a) is denied as dealing with comparatively unimportant matters.

Item 13(b) deals with more important matters and the indictment in this respect is extremely broad. It is treated as was 12(c) above.

Item 13(c) is denied as dealing with unalleged matter.

Item 13(d) is denied for the same reason and item 13(e) consequently becomes moot.

Item 13(f) is denied as dealing with unalleged matter.

Item 14, subdivisions (a), (b) and (d) are subject to one or both of the objections that they deal with unalleged matter or, like item 10, with matter which does not lend itself to precise statement.

Item 14(c) asks specification of the persons forced to make certain payments, the persons to whom the payments were made, when and where the payments were made, the moneys paid and the contracts on account of which such moneys were paid. These particulars closely approach in character the familiar type form of details as to agreements and must be supplied.

*Paragraph 35.* Item 1 is denied for the same reason as paragraph 34, item 1.

Item 2, with the later stated exception, is granted for the reason stated with respect to item 14(c) of paragraph 34. The Government need not state what prices it claims the manufacturers and jobbers would have paid in the absence of the conspiracy. That is a matter which does not lend itself to precise statement.

Item 3(a). These requests would be appropriate as interrogatories in a civil case. While it is true that requests for particulars in criminal cases must fulfill to some extent the function of interrogatories, these requests for the Government's views as to reasons why a given cause had an alleged effect are too far away from the traditional office of a bill of particulars to be granted.

Item 3(b), as I construe it, asks for details of instances where manufacturers and jobbers have been prevented from working with contractors of their own choosing. The indictment does not allege that there were any such instances —merely that they were not able to work with contractors of their own choosing. Perhaps the Government will rely on inferences without specific instances. Nevertheless evidence of such instances would be admissible as well under the allegation and defendants are entitled to such information as will permit effective preparation. Subdivision (b) is therefore granted.

What I have said with respect to item 3(a) applies as well to item 4(a).

What I have said with respect to item 3(b) applies as well to items 4(b), 5 and 6.

Item 7(a) is denied for much the same reason as item 3(a).

Item 7(b) is denied. Unlike item 3(b) it does not seek instances and the matter alleged in the indictment does not lend itself to precise statement.

*Second and Third Counts Generally.* Item 1. The relevant market is sufficiently stated in the indictment. This item is denied.

Items 2 and 3 are denied for the same reasons as item 3(a) of paragraph 34.

*Paragraph 38.* Defendants request the same particulars as with respect to paragraph 32 and the request is treated as paragraph 32 was.

*Paragraphs 40 and 41* ask the same particulars as paragraph 34, item 1 and paragraph 35, item 1 respectively and the requests are disposed of in the same manner.

*Paragraph 44* is disposed of as was paragraph 38 for the same reason.

*Paragraph 45* is disposed of as were paragraphs 40 and 41 for the same reason.

*Paragraph 46*, item 1 asks a more particular statement of the "portion" of production controlled and the period during which control has accrued. Defendants are entitled to have the statement as to control expanded as requested. Just what they want as to dates is hard to gather but the Government will be required to give the date prior to the date of the indictment on which control accrued to the members of the conspiracy.

Item 2 asks particulars as to the "manner" of control of defendants Local 25 and Kreindler. It is enough to say that the indictment contains no allegation of control by these defendants apart from the other conspirators. It is denied.

With respect to any matter concerning which the Government shall state in its bill of particulars that its knowledge or information is incomplete, the Government will state whatever knowledge and information it may have and furnish each defendant further particulars within ten days after it shall have obtained further knowledge or information.

The foregoing rulings will supply a large part of the information requested by other defendants. Insofar as particulars are asked by other defendants which have not been specifically granted or denied above, inspection indicates that counsel for the Government and the respective requesting defendants can apply the principles upon which the above rulings have been made and reach the result which I would have reached had I passed upon them. Insofar as this proves impossible the matter may be resubmitted to me.

### V. Motion for Leave to Make Further Motions.

 Defendants move for leave to make further motions with respect to this indictment, after the Government's compliance with any requirement of this decision concerning bills of particulars and discovery and inspection, and at any time before trial. Judge Palmieri fixed May 7, 1959, as the last day for making motions and this was extended to May 14, 1959 by Judge Murphy. The motions just disposed of were made within the time so fixed. The time to make motions has expired and no cogent reason has been advanced why I should grant further permission at this time. I disagree with defendants' contention that Rule 12 (b) (2) F.R.Crim.P. which provides that "failure of the indictment * * * to charge an offense shall be noticed by the court at any time during the pendency of the proceeding" permits defendants to disregard a direction of the court that such motions in advance of trial shall be made on or prior to a certain date.

Settle order on notice.