**Knox KERSHAW, Plaintiff,**

v.

**KERSHAW MANUFACTURING COMPANY, an Alabama Corporation, and Royce Kershaw, Defendants.**

**Civ. A. No. 1672–N.**

United States District Court
M. D. Alabama, N. D.
Sept. 19, 1962.

Godbold, Hobbs & Copeland, Montgomery, Ala., and Hare, Wynn & Newell, Birmingham, Ala., for plaintiff.

Fred S. Ball, Montgomery, Ala., for defendants.

JOHNSON, District Judge.

This cause was tried before the Court, without a jury, upon the issues made by the pleadings and proof. The final submission was upon the pleadings as finally amended and exhibits thereto, requests for admissions and responses thereto, stipulations of the parties, interrogatories and answers thereto, testimony taken by depositions, testimony of witnesses personally appearing before the Court and the several exhibits thereto, the pretrial order of this Court made and entered in this cause of March 9, 1962, and the briefs and arguments of the parties. Upon this submission, this Court, considering only what it accepts as credible testimony, now proceeds in this memorandum opinion to make the appropriate findings of fact and conclusions of law.

The plaintiff, Knox Kershaw, a citizen of the State of Mississippi, brings this action against his brother, Royce Kershaw, a citizen of Alabama, and the Kershaw Manufacturing Company, an Alabama corporation, of which Royce Kershaw is the president and, with other members of his family, owns all the common and a large portion of the preferred stock. Plaintiff claims against both the defendants in Counts I–A and II–A under §§ 1 and 2 of the Sherman Antitrust Act (15 U.S.C.A. §§ 1, 2). There is a count against the corporate defendant for breach of a contract that was entered into by and between the plaintiff and the corporate defendant on the 1st of March, 1957, and there is a count against the corporate defendant for sales commissions plaintiff claims to be due on sales of certain of its railroad machines and equipment in Venezuela. More specifically, the plaintiff in Count I–A claims of the defendants, separately and severally, the sum of $350,000 actual damages (the sum of $1,050,000 actual and treble damages), together with a reasonable attorney's fee under § 1 of the Sherman Antitrust Act, and says that the defendants' violations of that section of the act consisted of an unlawful contract dated March 1, 1957, entered into by and between the plaintiff and the defendant Kershaw Manufacturing Company, a combination or conspiracy between the defendants, which was unlawfully in restraint of trade and in restraint of interstate and foreign commerce, and whereby the defendants committed, since the execution of said agreement, certain acts which considered together with the agreement are unlawfully in restraint of interstate commerce and trade in violation of § 1 of the act. Plaintiff, insofar as this claim is concerned, says, first, that the execution of the contract itself constituted a violation of the Sherman Antitrust Act and, further, that the execution of the agreement, when considered together with the conduct and acts of the defendants before and after the execution of the agreement, constituted a violation of said act.

In Count II–A, still being more specific, the plaintiff claims the same damages as set out above with reference to Count I–A upon the theory that he sustained such damages as a proximate consequence of the defendants' having violated § 2 of the Sherman Antitrust Act by an unlawful monopolization of trade or commerce, attempts to monopolize trade or commerce, and a combination or conspiracy between the defendants to monopolize a part of trade or commerce. The claim in Count III made by the plaintiff against the corporate defendant is in the amount of $350,000 and is predicated upon defendant's breach of the contract of March 1, 1957. The claim in Count IV that plaintiff makes against the corporate defendant is in the sum of $3,600 (increased to $4,366.66) which plaintiff says is due as commissions by reason of

an agreement entered into between the plaintiff and the corporate defendant, whereby the plaintiff was retained as a sales representative for the company in Venezuela and as such representative was to receive a 10% commission on sales made by the plaintiff of the corporate defendant's track maintenance equipment.

To each of the claims made by the plaintiff, each of the defendants, where concerned, makes a general denial as reflected in the pretrial order of this Court; the general denial is understood to include a specific denial that the contract dated March 1, 1957, was illegal, that it was in the form of a trust, that it was in restraint of trade or commerce, that there is any illegal combination or conspiracy, or monopoly, or attempt to monopolize within the meaning of §§ 1 and 2 of the Sherman Antitrust Act. The corporate defendant specifically denies that it breached the contract which forms the basis for plaintiff's Count III. There is a general denial as to the claim plaintiff makes for sales commissions. As a special defense, the defendants say there was a release by the plaintiff of all rights against the defendants contained in an agreement dated January 3, 1949. As a further specific defense, defendants say that if the transaction between the parties culminating in the contract of March 1, 1957, was not lawful, then the plaintiff was a party thereto, is *in pari delicto*, and should not be allowed to profit by his own wrong.

The defendant Royce Kershaw counterclaims of the plaintiff in the sum of $12,-205.95 for advances and loans made by the defendant Royce Kershaw to the plaintiff, and made by certain members of the individual defendant's family and by the Royce Kershaw Company, Inc., the individual defendant saying that the claim against the plaintiff for advances made by others has in each instance been assigned to him. The defendant Kershaw Manufacturing Company counterclaims of the plaintiff in the amount of $4,163.66, claimed to be due for work and labor in the construction of the repairs and modifications to a certain pilot model of a bag loading machine, all for plaintiff's use and benefit.

This Court, by and with the agreement of the parties, on the 9th day of March, 1962, ordered and directed that this action be separated for trial, pursuant to the provisions of Rule 42(b), Federal Rules of Civil Procedure, 28 U.S.C.A., to the extent that a separate trial on the issues of liability was to be held prior to the time of the trial (if one is necessary) upon the issues of damages. The submission at this time is only upon the issues of liability.

■ This Court finds that it has jurisdiction of this case and each phase thereof. During the course of the trial, the corporate defendant was permitted to amend its answer to the extent that it denied jurisdiction of the Court as to the counts for breach of contract and sales commissions on the theory that the plaintiff, Knox Kershaw, is a citizen of Alabama and not a "nonresident" citizen within the meaning of the diversity statute. From the evidence taken and submitted to this Court concerning that point in this trial, this Court finds that the plaintiff, Knox Kershaw, is, and was at all times material to this litigation, a citizen of the State of Mississippi. There is no question but that the Court has jurisdiction of the Sherman Antitrust Act counts and there is no question in this case but that the requisite amount is in controversy in the remaining counts.

The plaintiff is a professional engineer and an inventor. He is a registered civil engineer, but has never been in the business of manufacturing machines for railroad maintenance or rehabilitation. The defendant Kershaw Manufacturing Company is a family corporation, with Royce Kershaw operating it for himself and his family. The corporation was organized in 1944 as a manufacturer of railroad maintenance and rehabilitation machinery. It manufactures such machinery for general sale and lease. This Court finds that Royce Kershaw is in active control of the defendant Kershaw Manufacturing Company and was active-

ly controlling that company at all times material to this litigation. The individual defendant is also president of the Royce Kershaw Company, Inc., this company being primarily engaged in railroad contracting and leasing certain equipment to railroads. Another company Royce Kershaw and Company, an inactive company, being a partnership between Royce and his wife, is a substantial owner of preferred stock in the Kershaw Manufacturing Company.

According to the evidence in this case, there are twenty-one concerns throughout the United States with whom Kershaw Manufacturing Company is in competition. Out of the approximate $27,900,000 industry sales in 1961, the corporation defendant in this case had a total of 7.2%, the manufacturers Fairmont, Jackson, R. M. C., and Nordberg having 21.5%, 18.0%, 14.4%, and 8.0% of the industry sales for said year, respectively. In relative financial strength, Kershaw Manufacturing Company for the year 1960 ranked fifth in the industry. The net worth of the companies Jackson Vibrators, Fairmont Railway Motors, Railway Maintenance Corporation, and Kalamazoo Manufacturing Company, was seven million, six million, three million, one million, plus, respectively. During this same period, Kershaw's net worth was less than one million. Since its inception, the defendant corporation has developed approximately 58 different machines, of which about 30 are no longer being made. As its present line, it has 28 machines for sale and lease, with its Ballast Regulator being its best seller and best money maker. It appears that Kershaw Manufacturing Company's ballast shaping machine is one of the foremost in the industry. Substantially everything the defendant company manufactures, including the Ballast Regulator, is under patents of Royce Kershaw, and most of it is under royalty agreements with him. The name "Kershaw" is nationally known in the railroad construction and maintenance equipment field. This reputation was created by and has grown with Kershaw

Manufacturing Company. The Ballast Regulator was originally developed by Royce Kershaw in 1945. It has been modified and improved over the years to the extent that in 1956 the corporation's sales of the ballast shaping machines reached its peak. Prior to the year 1945, Royce and Knox Kershaw engaged in various business relationships. In early 1946, Knox Kershaw was employed by Royce Kershaw as chief engineer for the Kershaw Manufacturing Company. After approximately two years, this relationship terminated, with a severe emotional disturbance and a lawsuit in the state courts of Alabama. This lawsuit was settled on January 3, 1949. The settlement agreement of that date is attached hereto as Appendix A. It is to be noted that Knox Kershaw released the defendants

"from all claims of every nature whatever, including all claims made in said suit pending in the Circuit Court of Montgomery, Alabama, * * * and the said Knox Kershaw hereby releases to the said Royce Kershaw all interest in or claim he may have against said corporate stock, royalties, bonuses, extra compensation, sales commissions, salary, expense account or any other claim against the said Royce Kershaw, Miriam Kershaw, The Kershaw Company, Inc., and any other partnership or corporation in which Royce Kershaw or Miriam Kershaw are financially interested, it being understood that henceforth the only business connection between Knox * * * and Royce * * * is as herein set out."

Sometime between the years 1945 and 1949, Knox Kershaw and John Patton also commenced to attempt to develop a ballast shaping machine, which has been referred to throughout this case as the "Universal Track Machine." This machine was designed to shape the railroad track ballast very similar to the manner in which the Royce Kershaw Ballast Regulator performs this function. It should be noted that a patent was issued

to Royce Kershaw on his machine in December 1945. Patents were issued to Knox Kershaw on his machine in February 1962. On several occasions, Knox Kershaw offered his machine and his rights therein to his brother, Royce Kershaw. Royce Kershaw evidenced no interest in the Universal Track Machine, even going so far on July 11, 1956, as to return the drawings to Knox Kershaw that had been forwarded him by Knox, with a letter stating that he was not interested in the Universal Track Machine. During this period, and particularly in the year 1956, Knox Kershaw, using the name "Kershaw Equipment Company" and operating from a headquarters in Montgomery, Alabama, contacted a number of parties, including railroads, in an effort to interest them in manufacturing the Universal Track Machine. These efforts continued, but without success, until the latter part of the year 1956 when Royce Kershaw, by a memorandum dated December 3, 1956, agreed to purchase Knox Kershaw's Universal Track Machine provided an acceptable contract could be worked out. The negotiations leading toward this contract were between Knox Kershaw and Jeff Davis, who was at that time the executive vice-president of Kershaw Manufacturing Company. These negotiations culminated in the March 1, 1957, sales agreement. This sales agreement is attached to this opinion as Appendix B. This Court finds that a material part (if not all) of the consideration for Kershaw Manufacturing Company's entering into this sales agreement with Knox Kershaw was to eliminate confusion in the use of the name "Kershaw," said confusion growing out of the solicitation by Knox Kershaw in the industry relative to his ballast shaping machine. Another significant portion of this agreement was the company's agreement to manufacture a pilot model of the Knox Kershaw ballast machine and to pay Knox Kershaw a royalty on its sales. This Court specifically finds that that part of the March 1, 1957, agreement concerning the manufacture of the pilot model of the Knox

Kershaw ballast machine was conditioned upon Knox Kershaw delivering to the Kershaw Manufacturing Company a complete set of dimension plans and drawings. This Court further specifically finds that Knox Kershaw failed to deliver such plans and drawings. As a matter of fact, the credible evidence reflects that the only plans and drawings that Knox Kershaw delivered to Kershaw Manufacturing Company, pursuant to this agreement, that related to the ballast machine was one rather small, crude diagram. This diagram did not purport to be a dimension drawing. This Court finds that it was impossible, from an engineering standpoint, to construct a pilot model of the proposed Universal Track Machine from such a drawing.

The theory of the plaintiff that there was a contract, combination or conspiracy between the company on the one hand and Royce Kershaw (acting for himself as well as the company) on the other hand, is not sustained by the evidence. In making this finding and conclusion, this Court has spent considerable time studying the evidence as it relates to the family history, the relations between the company and Royce Kershaw, the control of the operations by Royce Kershaw, the activities between Royce and Knox Kershaw during the times material to this litigation, the negotiations for the agreement dated March 1, 1957, the execution of the agreement, the terms of the agreement, and the fact that the defendant company did not make the pilot model of the Universal Track Machine. This Court has given considerable attention and thought to the evidence as it relates to the functions and competitive nature of the Universal Track Machine and the Ballast Plow and Ballast Regulator, particularly to the evidence that relates to a comparison of their features. This part of the plaintiff's claim seeks to recover on the theory that he has been injured in his business or property in violation of § 1:

"§ 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or

commerce among the several States, or with foreign nations, is declared to be illegal: * * *."

There is no question that § 1 may be violated (1) by a contract in restraint of trade or commerce, (2) by a combination in restraint of trade or commerce, and (3) by a conspiracy in restraint of trade or commerce. Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619. This Court rejects the theory of the plaintiff that the contract in question is a *per se* violation of this section. Instead, this Court specifically finds in this case that this contract was not for the purpose of eliminating or restricting the manufacture and distribution of the Universal Track Machine in interstate commerce. In addition, this Court specifically finds that the effect of the contract was not to restrict the production of the Universal Track Machine, but, to the contrary, was for the purpose of perfecting the machine so that it could be—if it was practicable—manufactured and produced for distribution in commerce, but without confusion as to the use of the name of "Kershaw." The contract in question was not designed and did not have the effect of illegally restraining competition in interstate commerce. This Court further finds that at no time material to this case was Knox Kershaw engaged in the manufacture of a ballast shaping machine. The evidence indicates that he had, in his mind, developed a ballast shaping machine and had constructed a scale model of that machine, which he called the "Universal Track Machine." There was no competition in the field of manufacturing ballast shaping machines between Knox Kershaw and either of the defendants. In this connection, see United Artists Corporation v. Strand Productions, 9 Cir., 216 F.2d 305. If it can be said that there was a restraint on interstate commerce by reason of the March 1, 1957, agreement, it cannot be said under the evidence in this case that this restraint was an unreasonable one. In connection with plaintiff's claim under § 1, this Court further finds that Royce Kershaw and the Kershaw Manufacturing Company did not enter into any contract or conspiracy, or combination in restraint of trade or commerce and did not act in concert to the extent that they violated the provisions of § 1 of the act. Not only was there no intent on the part of either of the defendants to restrain interstate or foreign commerce within the meaning of the Sherman Antitrust Act, but the effect of their action insofar as the March 1, 1957, contract is concerned was not to illegally restrain such trade or commerce. The effect of the action was not to lessen or prevent competition, since there was no competition in the field of manufacture in this instance within the meaning of the Sherman Act. This Court cannot make an application of the principles set out in United States v. Reading Co., 3 Cir., 183 F. 427; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; United States v. Eastern States Retail Lumber Dealers Ass'n, 2 Cir., 201 F. 581, affirmed 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490; United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010, to the facts in this particular case so as to be able to conclude that there was a restraint of trade or competition. Instead, in making an application of the "standard of reason" rule, as referred to by the Supreme Court in Standard Oil Company of New Jersey v. United States, supra, this Court is compelled to the findings and conclusions as herein made concerning the contract in question and the effect thereof. The mere fact that Knox Kershaw and the Kershaw Manufacturing Company entered into an agreement, the primary purpose of which was to eliminate the confusion in the use of the Kershaw name that was growing out of Knox Kershaw's attempts to market and sell his ballast machine, cannot justify a condemnation of the contract or an action of the parties within the meaning of § 1 of the Sherman Antitrust Act. See Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825.

454

As to plaintiff's claim predicated upon § 2 of the act,[1] this Court finds and concludes that neither of the defendants has monopolized, or attempted to monopolize, or combined or conspired with anyone in an attempt to monopolize. In arriving at and in making this finding and conclusion, this Court has given due study to and consideration of the evidence as it relates to the execution of the agreement in question, the family history, the relations between the company and Royce Kershaw, the invention and manufacture of the Ballast Regulator and the invention of the Universal Track Machine, the attempts by Knox Kershaw to manufacture the machine, and the functions and competitive nature of each of the said machines. In the first place, Kershaw Manufacturing Company and/or Royce Kershaw, acting jointly or separately, did not occupy such a position in the field of railway maintenance equipment manufacturing as to be able to exclude competition. In the second place, there was no intent on the part of any of the parties to the March 1, 1957, contract to exercise the power to exclude competition. In the third place, there was no exclusion by the Kershaw Manufacturing Company and/or Royce Kershaw within the meaning of the act. In this connection, see American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575. The words "monopoly" and "monopolize" carry with them the idea of exclusion or restraint. This section of the act does not forbid the action of these defendants which was nothing more than good business practice. See United States v. Keystone Watch Case Co., 3 Cir., 218 F. 502; Montrose Lumber Co. v. United States, 10 Cir., 124 F.2d 573; also see Toulmin's Anti-Trust Laws, Vol. 1, Chap. 15.

In addition to what this Court has stated above relative to plaintiff's claims under the Sherman Antitrust Act, it should be noted that § 15, Title 15, United States Code Annotated, only gives a civil cause of action to "Any person who shall be *injured in his business or property* by reason of anything forbidden in the antitrust laws * * *." (Emphasis added.) In this connection, the evidence, insofar as the antitrust claims in this case are concerned, is completely lacking when it is examined for the purpose of attempting to find where Knox Kershaw was "injured in his business or property." Knox Kershaw was not in the business of manufacturing ballast regulating machines. He had merely devised a machine that he hoped to produce and market by reason of the March 1, 1957, contract. It is fair to say that his only hope of accomplishing this was through his brother and his brother's company.

If this Court is incorrect in its conclusion that there has been no violation of either § 1 or § 2 of the antitrust act, then this Court finds that the fact that the plaintiff, Knox Kershaw, entered into the agreement of March 1, 1957, and even instigated the agreement, makes it necessary to permit the defendants to invoke their *pari delicto* defense. In such instances, as this Court understands the cases, the law leaves the parties where it finds them. See Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 51 S.Ct. 476, 75 L.Ed. 1112; and Pennsylvania Water & Power Company v. Consolidated Gas, Electric Light & Power Co., C.C.A.4 1953, 209 F.2d 131, cert. den. 347 U.S. 960.

For the reasons heretofore stated, this Court finds and concludes that Kershaw Manufacturing Company did not breach its contract of March 1, 1957. The failure of the company to build a pilot model (which constitutes the breach, according to plaintiff's theory) was necessitated by the failure on the part of the plaintiff to deliver the "complete sets of dimension plans and drawings," as required of him by the contract. Knox Kershaw cannot, under such circum-

1. § 2—"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty * * *."

stances, take advantage of the failure of performance on the part of the Kershaw Manufacturing Company. Selman v. Bryant, 261 Ala. 53, 72 So.2d 704; World's Exposition Shows v. B. P. O. Elks, No. 148, 237 Ala. 329, 186 So. 721.

As to the defense set forth as a special defense to Counts I–A, II–A and III, that is, that there was a release by the plaintiff, Knox Kershaw, of all rights against the defendants contained in an agreement dated January 3, 1949, this Court finds that the evidence does not justify the conclusion that the parties in the execution of the January 3, 1949, document contemplated a release of any rights that Knox Kershaw might have that form the basis for Counts I–A, II–A and III in this case. This Court concludes that this release did not cancel the claims Knox Kershaw now makes in this case. This conclusion is reached from an examination and study of the evidence in this case and from an examination and study of the document the defendants claim operated as a release. From all these circumstances, it would be unrealistic to conclude that the release of January 1949 was intended to cancel any claims which may have arisen or were to arise between the parties as those claims are involved in this lawsuit. A short answer to this contention on the part of the defendants is that it had not become fully evident that the claim Knox Kershaw now makes would be appropriate. The defendant company could have still constructed the pilot model of the track machine had Knox Kershaw furnished the dimension plans.

As to the counterclaim of Royce Kershaw in the amount of $12,205.95, this Court finds as follows: The claim of $1,900.21 is for "cash advances made by Royce Kershaw, Jr., and Knox Kershaw, II, to the plaintiff which have been assigned to this defendant." There is no evidence in this case of an assignment, either oral or written. There is no evidence in this case which authorizes Royce Kershaw to make this claim on behalf of Royce Kershaw, Jr., and Knox Kershaw, II. As to that part of Royce

Kershaw's counterclaim in the amount of $1,498.15, which is based upon "Cash advances and other charges of Royce Kershaw Company, Inc. which were assigned to this defendant," there is no evidence of any such assignment of a claim from that company to Royce Kershaw individually. As to that part of the counterclaim of Royce Kershaw in the amount of $2,307.59, this Court finds that there is no evidence in this case concerning any such "advances made on interest payments, travel expenses and cash advances." That part of Royce Kershaw's counterclaim in the amount of $5,000 "For payment of promissory note dated September 29, 1958," and that claim for $1,500 "For advance to purchase additional stock in Cuidad Boliver Country Club" were not controverted and were sustained by the evidence. Royce Kershaw is therefore entitled to recover of the plaintiff, Knox Kershaw, on his counterclaim in the amount of $6,500.

As to the counterclaim of Kershaw Manufacturing Company in the amount of $5,105.31 "less the said credit of" $941.65, leaving a total in the corporate defendant's counterclaim of $4,163.66, this Court finds no evidence in support thereof. This Court concludes, therefore, that the corporate defendant's counterclaim in the amount of $4,163.66 fails.

The only remaining claim between the parties in this litigation is that of Knox Kershaw's claim of the defendant Kershaw Manufacturing Company that Knox Kershaw says is due as commissions by reason of an agreement entered into between him and the corporate defendant, whereby he was a sales representative for the company. In this connection, this Court finds that in September 1956, Knox Kershaw was working in Venezuela. About this time, the company agreed with Knox Kershaw that he could represent it on the sale of equipment to certain mining companies in that country for a 10% sales commission. On July 27, 1959, the company agreed to pay Knox Kershaw a 10% sales commission on an order from the Orinocco Mining Company if such order was received.

456

This company did not order. However, Knox Kershaw had been at that time negotiating with other mining companies in the country of Venezuela, and in March 1960 secured an order for a Ballast Regulator. The company acknowledges its obligation (even though there had previously been some indication the arrangement between them had been terminated) to Knox Kershaw for a commission, but only in the amount of 5%. This Court finds that he should have received a commission of 10%. The company has not paid him any of the commission that he was due on that sale, namely, $1,883.30. Further, as to the "commissions count," this Court finds that Knox Kershaw is due a 10% commission on the sale of equipment to the Ministry of Communications of Venezuela. The evidence in this case as to this sale shows that Knox Kershaw was responsible for the sale evidenced by the Kershaw Manufacturing Company, Inc.'s invoice of October 8, 1959, in the amount of $24,833.58. This sale grew out of the actions by Knox Kershaw as its sales representative and the order was received one week prior to the time the Kershaw Manufacturing Company attempted to terminate the commission agreement with Knox Kershaw. This commission is in the amount of $2,483.36. Knox Kershaw is therefore entitled to a judgment against the Kershaw Manufacturing Company in the total amount of $4,366.66.

A formal judgment will be entered in this case in accordance with the foregoing.

The costs incurred in this proceeding will be taxed one-third against Knox Kershaw, one-third against Royce Kershaw individually, and one-third against Kershaw Manufacturing Company.

## APPENDIX A

"STATE OF ALABAMA }
"MONTGOMERY COUNTY }

"MEMORANDUM OF AGREEMENT entered into in consideration of the mutual agreements herein contained between Knox Kershaw, Royce Kershaw and Miriam Kershaw, on this January 3, 1949.

"WITNESSETH

"WHEREAS, there are certain contracts in which certain of the parties to this agreement have interests and there are certain corporations in which certain of the parties hereto have stock and there are partnerships or other business relationships between some of the parties hereto and there are certain rights with reference to patents or applications for patents and there is pending in the Circuit Court of Montgomery County, Alabama, in Equity, Number 19792, a suit filed by Knox Kershaw against Royce Kershaw and Miriam Kershaw and certain corporations and partnerships named therein and claims are made in said suit which are in all respects denied by Royce Kershaw and Miriam Kershaw and said corporations, but the parties have now agreed upon a compromise and settlement of all matters between them as herein set out, it is, therefore, agreed by the parties as follows:

"1. The contract between Knox Kershaw and The Kershaw Company, Inc., dated September 25, 1947, and amended February 10, 1948, and any other contract or agreement or contract with reference to royalties on auger type cribbing machines are cancelled effective as of this date.

"2. The contract dated March 27, 1947, between Knox Kershaw and The Kershaw Company, Inc. providing for assignment of patent and payment of royalties on a wheel-type cribbing machine shall remain in effect and shall not be affected by this agreement. The machine covered herein is described in the attached pamphlet, marked 'Exhibit A'. [Exhibit is not attached to this appendix.]

"3. All contracts of every nature, written or oral, except as herein set out, to which the said Knox Kershaw is a party, either with Royce Kershaw, Miriam Kershaw, or The Kershaw Company, Inc. or Royce Kershaw Company, Inc., or any other corporation in which Royce Kershaw or Miriam Kershaw are

officers or stockholders are hereby cancelled and terminated.

"4. Except as herein otherwise provided, Knox Kershaw hereby releases Royce Kershaw, Miriam Kershaw, The Kershaw Company, Inc., Royce Kershaw Company, Inc. and any and all other corporations or partnerships in which Royce Kershaw or Miriam Kershaw are financially interested from all claims of every nature whatever, including all claims made in the said suit pending in the Circuit Court of Montgomery County, Alabama, in Equity, by the said Knox Kershaw against Royce Kershaw and others, numbered 19792 on the docket of said court, and agrees to promptly dismiss said suit and this instrument shall be authority for the dismissal of said suit and the said Knox Kershaw hereby releases to the said Royce Kershaw all interest in or claim he may have against any corporate stock, royalties, bonuses, extra compensation, sales commissions, salary, expense account or any other claim against the said Royce Kershaw, Miriam Kershaw, The Kershaw Company, Inc., and Royce Kershaw Company, Inc., and any other partnership or corporation in which Royce Kershaw or Miriam Kershaw are financially interested, it being understood that henceforth the only business connection between Knox Kershaw on the one hand and Royce Kershaw and Miriam Kershaw on the other is as herein set out. Knox Kershaw releases Royce Kershaw and his guarantors of and from any and all liability on the injunction bond recently filed in the suit of Royce Kershaw vs. Knox Kershaw in the Circuit Court of Montgomery County.

"5. Royce Kershaw has paid to Knox Kershaw at the time of the signing of this instrument Six Hundred and no/100 ($600.00) Dollars, receipt of which is acknowledged in full settlement of all amounts owing or claimed to be owing to Knox Kershaw by the said Royce Kershaw or Miriam Kershaw or any partnership or corporation in which Royce Kershaw or Miriam Kershaw are interested except as to the said contract of March 27, 1947, which is the only contract remaining uncancelled.

"6. Knox Kershaw shall have a used typewriter and a used desk as his own, and shall also have the right of the full use, for a period of one year from this date, of a transit, line rod, level rod, and one Monroe calculator, except that in event Royce Kershaw should need the use of the surveying equipment just mentioned, he shall have the right to the temporary use of it from time to time.

"IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as above stated.

"WITNESS:

"/s/ Mabel P. Coney

"/s/ J. W. Davis

| /s/ | Knox Kershaw | (SEAL) |
| | (Knox Kershaw) | |
| /s/ | Royce Kershaw | (SEAL) |
| | (Royce Kershaw) | |
| /s/ | Miriam Kershaw | (SEAL) |
| | (Miriam Kershaw) | |

"I hereby consent to the foregoing compromise settlement.

"/s/ Files Crenshaw

"(Files Crenshaw)"

APPENDIX B

"STATE OF ALABAMA

"MONTGOMERY COUNTY

"SALES AGREEMENT

"The Circumstances existing at the time of this agreement are as follows:

"(a) Kershaw Manufacturing Company, an Alabama corporation with its principal place of business in Montgomery, Alabama, but with interests in subsidiary concerns located elsewhere, is and for a number of years has been engaged, among other things, in manufacturing railroad track maintenance machines, and the parts therefor, for sale or lease to railroads or other parties having need for such equipment. It has its own patent right protection as well as the right to use patent rights of others

which it uses in connection with its manufacturing business. The founder and chief owner is Royce Kershaw, herein called Royce.

"(b) John Knox Kershaw of Montgomery, Alabama, a brother of Royce Kershaw, herein called Knox, is and has been chiefly engaged in his profession as a professional engineer. He has an invention which he calls a 'Universal Track Machine' for handling railroad track ballast in which he either has or will apply to the U. S. Patent Office for certain patent rights in one or more patents.

"(c) The solicitation of Railroads by the Company and by Knox, both using the name Kershaw, in the opinion of the Company has caused or may, if continued, cause confusion and loss to the Company.

"IN CONSIDERATION of the premises, of the mutual agreements herein contained, and of Twenty-five Hundred and No/100 ($2500.00) Dollars paid by the Company to Knox, Fifteen Hundred and No/100 ($1500.00) Dollars of which previously has been paid and the balance of which shall be paid upon execution of this contract, the receipt of which is hereby acknowledged, the parties agree as follows:

"1. Except for the royalty payments herein provided for, said sum of $2500.00 shall be in full, final and complete payment to Knox for all his interest in his railroad track maintenance equipment or any other equipment in any way relating to machines for use by railroad.

"2. Knox further agrees to promptly deliver to the Company:

"(a) A complete set of dimension plans and drawings for his said ballast handling machine and any and all other plans and drawings for other machines relating to railroad track maintenance he may now or hereafter have in his possession.

"(b) A miniature model of said ballast handling machine and any other models now or hereafter in his possession.

"(c) All railroad equipment patents issued or on which applications for patents are pending now or hereafter and all correspondence, records and other written material relating thereto.

"(d) Any and all future inventions he may have or develop and all improvements on his inventions relating to railroad track maintenance without disclosing the idea to any other party or attempting to obtain a patent thereon.

"3. Knox hereby assigns to the Company all of his title and interest in the following patents:

"Patent No. 2,646,632, 'Off Track Auger', July 28, 1953

"Patent No. 2,640,285, 'Multiple Wheel Cribber' June 2, 1953

"Patent No. 2,597,337, 'Railway Track Tool' May 20, 1952

"Patent No. 2,547,596, 'On Track Auger' April 3, 1951

"Patent No. 2,449,714, 'On Track Auger No. 1' September 21, 1947

and all drawings, correspondence, and written material related thereto and agrees to execute any and all formal assignments requested by the Company in connection therewith. Knox warrants that his ownership of his interest in the invention and patents hereby conveyed is clear and free of encumbrance and that he has a perfect right to assign them as herein provided.

"4. Knox agrees that he will at all times hereafter while this agreement is in force refrain from soliciting either orally, in writing or otherwise any railroad or other prospective purchaser with reference to the sale, lease or otherwise of anything relating to railroad track maintenance equipment and that he will promptly forward to the Company all inquiries, letters or other communications received by him in the future from any railroad or other interested party relating to railroad track maintenance equipment.

"5. Knox agrees that as long as this agreement is in force and effect he will not, in Montgomery County or elsewhere,

directly or indirectly engage in any business or activity in any way competitive with the present or any future business of the Company which relates in any way to railroad track maintenance equipment.

"6. Knox agrees that he will promptly sign all letters or other communications prepared by the Company for transmittal in his name to railroad companies notifying them of the effect of this agreement or of the fact that he is no longer engaged in the sale or lease of railroad track maintenance equipment or any machines relating in any way to railroads generally.

"7. Knox agrees to promptly deliver to the Company his complete file and all of his correspondence, purchase orders, photographs, plans and other data relating to any of the inventions assigned hereunder and to furnish any further information requested by the Company in connection therewith at any time.

"8. The Company agrees:

"(a) To manufacture at its sole expense within one year from March 1, 1957, a pilot model of a railway ballast handling machine which Knox calls the 'Universal Track Machine' which shall embody certain features which are covered by Knox's patents or patent applications but it shall not be required to keep or warehouse the machine but shall be free to sell it as it may see fit.

"(b) As each railway ballast handling machine of the type covered by Knox's patent or patents is sold, the Company shall pay Knox not later than the 15th day of the following month royalty as follows:

"(c) After Knox furnishes the Company with the serial number or numbers of the application for United States patent the Company shall pay Knox a royalty of 1½% of the sales price f. o. b. sale point. If and when the patent applications is granted pursuant to the application therefor the Company will pay an additional 1½% of the said sales price on machines sold prior thereto on which the 1½% has been paid.

"(d) After letters patent have been issued pursuant to said application and have been duly assigned to the Company, it shall increase the said royalty to 3% of the said sales price.

"(e) The payment of a royalty either before or after the patent has been granted shall be conditioned upon there being at that time no litigation or pending litigation with reference to the validity or scope of the patent or any of its claims or with reference to infringement in any way.

"(f) Payments as stated shall not be made after the expiration of the patent rights or if litigation is instituted in connection therewith, or if the patent application is denied.

"(g) In the event the Company in manufacturing or selling any of its own machines on which no royalty payment hereunder would be due, should wish to embody into the machine some part, group of parts, or assembly of parts that are covered by a Knox patent application or patent, the Company will pay a royalty on the same basis as hereinabove set out based on the then manufacturer's published selling price f. o. b. selling point of the part, group of parts or assembly.

"9. It is agreed that if disputes arise over this contract that settlement shall first be negotiated by arbitration.

"10. This agreement contains the entire agreement between the parties.

"IN WITNESS WHEREOF, the respective parties have executed this agreement on this 1st day of March, 1957.

"KERSHAW MANUFACTURING COMPANY

"By ———————————

    As its ———————————

"(John Knox Kershaw)"